**SEARS, ROEBUCK AND COMPANY**
and The Plymouth Rubber Company, Inc., Appellants,

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, Appellee.**

No. 7298.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 15, 1957.

Decided April 1, 1957.

Hector M. Holmes, Boston, Mass. (Thornton H. Brooks, Greensboro, N. C., H. L. Kirkpatrick and E. T. LeGates, Boston, Mass., on the brief), for appellants.

Lawrence C. Kingsland, St. Louis, Mo. (Welch Jordan, Greensboro, N. C., Estill E. Ezell, St. Louis, Mo., Harold J. Kinney, St. Paul, Minn., M. K. Hobbs, Platteville, Wis., and Stanley G. DeLaHunt, St. Paul, Minn., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and SOBELOFF, Circuit Judges.

SOPER, Circuit Judge.

The complaint in this suit charges infringement of United States Reissue Patent No. 23,843 granted on June 29, 1954, to Ralph J. Oace, Robert Burns Snell, and Esther E. Le Page, assignors to Minnesota Mining and Manufacturing Company, the plaintiff in the District Court. The original patent No. 2,559,990 was dated July 10, 1951, and the application for reissue was filed July 9, 1952.

The invention relates to the insulation and protection of electrical conductors. For this purpose the patent specifies an adhesive insulating tape, composed of a film backing mixed with a non-volatile liquid plasticizer, a soft and viscous resinous plasticizer, and an adhesive coating united to the inner surface of the film backing. The claims of the reissued patent in issue in the pending case are claims 1, 3 and 4, which are identical with like numbered claims of the original patent, and claims 6, 7, 8 and 9, which are new in the reissued patent. Typical claims 1 and 6 are set out in full below.[1]

1. *Claim 1*

"1. A pressure-sensitive adhesive insulating tape wound upon itself in roll form and comprised of: a stretchable and elastic film backing having a thickness of 4 to 20 mils and formed of a homogeneous mixture primarily consisting of a stable blend of a film-forming polymer of monomers including at least a major proportion of vinyl chloride, a substantially non-volatile liquid phytalyl ester plasticizer amounting to 8 to 20 parts per 100 parts of said polymer, and a soft and viscous low-acid-number alkyd plasticizer resin in amount at least equal to the amount of said liquid phthalyl ester plasticizer, the total amount of said plasticizers being about $\frac{1}{3}$ to $\frac{1}{2}$ the amount of said polymer and the proportions being such that the adhesive tape has the properties of stretch and elasticity hereafter specified without causing pastiness or tack-loss of the contacting adhesive in the roll; and a eucohesive normally tacky and pressure-sensitive rubber-resin type adhesive coating united to the inner face of said film backing; said adhesive tape being unwindable without delamination or offsetting of adhesive, being originally stretchable by handpulling to an extent of at least 50% at room temperature and being substantially completely retractable from an elongation of 30% as herein specified."

*Claim 6*

"6. A pressure-sensitive adhesive insulating tape wound upon itself in roll form and comprising: (1) a water-insoluble and hydrocarbon-oil-insoluble film backing of high dielectric strength containing a stabilizer and having a thickness of 4 to 20 mils and formed of a homogeneous mixture primarily consisting of a stable blend of (a) a film-forming polymer of monomers including at least a major proportion of vinyl chloride, and (b) a substantially non-volatile plasticizing material therefor in an amount within the range of at least $\frac{1}{3}$ the weight of said polymer but in a substantially lesser amount than said polymer and comprising at least a major proportion of a non-migrating viscous plasticizer resin, and the proportions being such that the adhesive tape has the properties of stretch, elasticity and retractability hereafter specified without causing pastiness or loss of the tack of the contracting adhesive in the roll; (2) an adhesive primer coating on the inner face of the film backing adapted to increase the anchorage of the adhesive coating; and (3) a water-insoluble normally tacky and pressure-sensitive rubber-resin type adhesive coating united to the inner face of said film backing, over said primer coating, said adhesive coating being thin in relation to said film backing; said film backing being in permanent equilibrium with said pressure-sensitive adhesive coating so as to avoid pastiness or loss of tack of said adhesive coating and diminution of the flexibility of said film backing; said adhesive tape being unwindable from the roll without delamination of the tape or offsetting of the adhesive, being originally stretchable in widths not greater than about one inch by simple hand-pulling, exercising a force of not more than about 10 to 15 pounds, to an extent of at least 50% at room temperature and being substantially completely retractable from an

The defendants are Sears, Roebuck and Company and Plymouth Rubber Company, Inc. Sears sold a stretchable and retractable pressure-sensitive tape under the brand name of "Homart", which was manufactured by Plymouth and is alleged to have infringed the patent. The main defenses are (1) that the accused article does not infringe the claims of the patent because there was omitted from its composition one of the ingredients specified in the claims, and (2) that claims 6 to 9, which first appeared in the reissue, are invalid if construed to omit that element from the patented structure. The District Judge held all the claims valid and infringed.

The insulating tape manufactured by the plaintiff under the patent was a great improvement over prior insulating devices and met with much commercial success. The materials which entered into the composition of the new tape were well known. Vinyl resin, plasticizers and pressure-sensitive adhesives were all old. The problem was to plasticize the vinyl resin in the backing member so that the plasticizer would not migrate into the adhesive and impair its cohesive function, and so that portions of the plasticizer would not exude from the surface of the film upon the underlying adhesive layer when the tape was wound in a roll and cause a loss of tack. The inventors overcame these difficulties and produced a strong, stretchable and retractable article that furnished effective insulation in the splicing of electric wires and cables.

This result was accomplished by securing a permanent equilibrium between the vinyl backing and the adhesive by combining the ingredients in the manner described in the following excerpt from the specification of the patent:

"In order to secure permanent equilibrium between backing and adhesive, we employ with the vinyl

chloride polymer a combination of modifiers including a substantial but minor amount (not to exceed about 20 parts per 100 parts of the vinyl polymer) of a low molecular weight liquid plasticizer such as dioctyl phthalate, together with a substantially equal or somewhat greater amount of a high molecular weight resinous type plasticizer, the amount of the latter in any event being sufficient, together with the liquid plasticizer, to provide the desired degree of stretch in the final film. "Paraplex G–25" is a preferred example of a suitable resinous type plasticizer. It is sold by Resinous Products & Chemicals Corp., and is a soft, viscous alkyd resin having a specific gravity of 1.06, and an acid number of not more than 2.0; it is soluble in esters, ketones, aromatic and chlorinated hydrocarbons. Another high-molecular-weight plasticizer material which has been found useful in providing suitably stretchable and elastic vinyl polymer films is polymerized ethyl acrylate. Another example is polymerized vinyl butyl ether.

"While resinous or high molecular weight modifiers such as "Paraplex G–25" are themselves capable of producing the desired degree of strength, stretch and elasticity in vinyl chloride polymer films, and furthermore are generally classed as "non-migrating" or "permanent" type modifiers or plasticizers, it is surprisingly found that these materials do not provide for permanent equilibrium of adhesive and backing as herein defined. Instead, it has been shown that pressure-sensitive adhesives in prolonged contact with highly stretchable and elastic films consisting solely of vinyl polymer and resinous modifier lose a great deal, if not all, of their initial tacki-

elongation of 30%, as herein specified; said tape being readily conformable to irregular surfaces in insulating wire splices and its elasticity, retractability and high adhesion value making it easy,

in insulated splices, to produce snug wrappings and coverings, and said tape having sufficiently aggressive adhesiveness to remain tightly and snugly wrapped around splices and wires."

ness or pressure-sensitivity. When tape made in this way is unwound from roll form, after a moderate period of storage, and applied to a splice, it does not adhere either to the electrical conductor or to its own backing, and hence is of no value as an insulating and protective coating."

Based on this disclosure, typical claim 1 of the patent declares that the patented tape is comprised of an elastic film backing formed of a homogeneous mixture consisting of a blend of (1) a major proportion of vinyl chloride, (2) a substantially non-volatile liquid phytalyl ester plasticizer, (3) a soft and viscous low-acid-number alkyd plasticizer resin in amount at least equal to the amount of the liquid plasticizer, and (4) a pressure-sensitive rubber resin type adhesive coating united to the inner surface of the film backing.

Testimony bearing on the investigation and experiments which lead to the invention confirms the foregoing statement in the specification as to the ingredients of the product listed in claim 1. In 1938 or 1939, the plaintiff commenced its efforts to make a suitable adhesive plastic tape, using commercial vinyl (VYNS) with 25% to 40% of liquid tricresyl phosphate plasticizer, and a standard pressure-sensitive adhesive; but the experiment was unsuccessful, because the plasticizer migrated and made the adhesive very soft and pasty. In 1942 or 1943, Rohm and Haas, a widely known chemical company of Philadelphia, produced a new type of high-molecular-weight resinous plasticizer known as "Paraplex G–25", which could be combined satisfactorily with vinyl without causing migration. Early in 1944 plaintiff's research workers, to whom the patent in suit was subsequently issued, began to experiment with G–25 in combination with standard vinyl and

standard adhesives from stock in an effort to make a satisfactory insulating tape. They found that G–25 did not migrate to the adhesive or soften it as the liquid plasticizer had done, but it did cause a loss of tack in the adhesive. Thus finding that neither the liquid nor resinous plasticizer when used alone gave satisfactory results, they tried a mixture of the two using a combination of dioctyl phthalate (DOP), a low-molecular-weight plasticizer, and G–25, a high-molecular-weight resinous plasticizer. This combination solved the difficulty and subsequently lead to the production and sale of the plaintiff's commercial article in 1945 and to the application for the original patent in 1946. The product speedily came into wide use and sales advanced from a little over $8000 during the year 1945 to more than $8,000,000 in 1953.[2]

The defendant, Plymouth Rubber Company, entered the field subsequently and began to experiment with adhesive vinyl plastic tape in 1948. It also had migration difficulties when it used the standard liquid plasticizer DOP and also found that G–25 was hard to disperse. Thereupon it experimented with G–40 as the sole plasticizer and found that it gave satisfactory results. Using it as the sole plasticizer the defendant produced a commercial article, which it put on the market in 1950 before the original patent was issued on July 10, 1951. The plasticizer G–40 was also manufactured by Rohm and Haas in 1945. It is a high-molecular-weight resinous plasticizer similar to G–25 but less expensive. It had also been used experimentally as the sole plasticizer by plaintiff's researchers, who reported that it was substantially equivalent to G–25 and caused a loss of tack but less loss than G–25. In 1946 or 1947, the plaintiff substituted G–40 for G–25 in the mixture with DOP in its commercial operations

---

2. As we have seen, claim 1 of the patent calls for a liquid plasticizer amounting to 8 to 20 parts per 100 parts of the film backing and a soft and viscous plasticizer resin in an amount at least equal to the amount of the liquid plasticizer. Claim 4 prescribes the use of 70 parts of vinyl, 10 parts of liquid plasticizer and 20 parts of resinous plasticizer.

and this mixture became its standard commercial product.

In 1954, Plymouth found that by using a certain wax G–25 could be used successfully with vinyl as the sole plasticizer and prior to the institution of the pending suit made and sold such a product to the United States and, to some extent, to the general trade. In the complaint filed in the pending case plaintiff charges infringment by the defendant by the use of both G–25 and G–40 as the sole plasticizer.

 The facts so far related give substance to the main defense to the suit that the defendants did not infringe the patent because they omit from their production one element or ingredient, to wit, the liquid plasticizer, which is specified in the claims of the patent. It is well established that there is no infringement when this occurs even though the same result is obtained because the accused article is not covered by the claims of the patent. See Vance v. Campbell, 1 Black 427, 429, 66 U.S. 427, 17 L.Ed. 168; Acme Steel Co. v. Eastern Venetian Blind Co., 4 Cir., 227 F.2d 914; Anthony v. Sherman, 4 Cir., 159 F.2d 995; Kaumagraph Co. v. Superior Trade-Mark Mfg. Co., 2 Cir., 72 F.2d 417; Wichita Visible Gasoline Pump Co. v. Clear Vision Pump Co., 8 Cir., 19 F.2d 435. This defense is not avoided by securing a reissue of a patent and omitting the disputed element from the claims unless the invention disclosed in the reissued is the very invention intended to be secured by the original patent. In United States Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corps., 315 U.S. 668, 62 S. Ct. 839, 86 L.Ed. 1105, the patent before the Court related to the production of ethylene oxide by bringing ethylene and oxygen in the reaction chamber in the presence of a catalyzer and of water as an essential. The Court held that a reissue of the patent, which treated the introduction of water as permissive but not mandatory, was void since it was not for the same invention described and intended to be secured by the original pat-

ent. The Court said, 315 U.S. at page 675–676, 62 S.Ct. at page 843:

"The question is whether, in the light of the disclosures contained in the two patents, they are for the same invention. This court has said that they are if the reissue fully describes and claims the very invention intended to be secured by the original patent; if the reissue describes and claims only those things which were embraced in the invention intended to have been secured by the original patent; if the broader claims in the reissue are not merely suggested or indicated in the original specification but constitute parts or portions of the invention which were intended or sought to be covered or secured by the original patent. The required intention does not appear if the additional matter covered by the claims of the reissue is not disclosed in the original patent. If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original."

The plaintiff in its reply does not challenge the established doctrine that a product patent is not infringed by an article which omits one of the elements of the patented structure, but advances the counter-contention that the defendants have misinterpreted the teaching of the patent. It is now said that the patent discloses that the insulating tape, in addition to the vinyl and the adhesive, may be made either with a blend of liquid and resinous plasticizers or simply with a resinous plasticizer alone which

combines within itself both light and heavy molecules; and that claims 1 to 5 of the patent cover a tape of the first sort while claims 6 to 9 cover a tape in which only a resinous plasticizer is used. This view is based largely upon certain statements in the specification that polymerized ethyl acrylate "has been found useful in providing suitable, stretchable and elastic vinyl polymer films." The evidence shows that this substance described in the specification as "another high-molecular-weight plasticizer material" also contains molecules of relatively low weight; and the Judge found that "the patent in suit teaches persons skilled in the art that ethyl acrylate polymer may be used as the plasticizer for the film backing of the tape of the patent." The plaintiff's expert, Tierney [3], produced at the trial below a sample of tape made under his direction in which ethyl acrylate polymer was the sole plasticizer, and according to his testimony gave satisfactory results.

These references, however, do not support the plaintiff's contention or the Judge's finding. The specification does not show that ethyl acrylate polymer may be used as the sole plasticizer but, to the contrary, clearly teaches that it is to be used in place of the resinous plasticizer called for by the patent. The specification expressly states that "Para-

plex G-25 is a preferred example of a suitable resinous type plasticizer" and then declares in the phrase above quoted that ethyl acrylate polymer is another high-molecular-weight plasticizer which has been found useful. Later in the specification ethyl acrylate polymer is again referred to as a high-molecular-weight plasticizer which "may be substituted in whole or in part for the specific alkyd resin hereinbefore mentioned"; and G-25 is described in the specification "as a soft viscous alkyd resin." Reading only these portions of the specification referring to ethyl acrylate polymer demonstrates the frailty of the plaintiff's contention and combining them with the emphatic assertion above quoted that both types of plasticizers must be used to give good results shows beyond question that the finding was clearly erroneous [4].

■■ If Tierney during the experimental period had succeeded in making an insulating tape with a single plasticizer, the product doubtless would have been the basis for a patent claim, but it was "surprisingly found" that this could not be done. It is not sufficient for a patent to suggest a field for further experimentation; to be valid it must itself disclose the essential elements of the discovery so that persons skilled in the art may practice it. See 35 U.S.C. § 112;

3. Hubert James Tierney was chief chemist of the plaintiff company from 1934 to 1943, Tape Products manager from 1943 to 1948, manufacturing manager of the Tape Division of the company from 1948 until 1952, and since that time he has been vice president of the company in charge of Tape Research and Tape Manufacturing. He supervised the research by the inventors of the patent in suit during the experimental period.

4. The following statement was made by the inventors during the progress of their application through the Patent Office, in order to distinguish their discovery from an earlier patent to Robertson. Referring to this patent they said:

"There is no suggestion of the three-way blend used by applicants, employing the vinyl chloride polymer, the liquid phthalyl ester, and the alkyd resin, combined together. That this three-way blend is essential to the success of applicants' product was clearly pointed out in the application as filed. Thus on page 2 it was pointed out that the phthalate plasticizer used alone resulted in inadequate stretch and elasticity, particularly in respect to backings of the thickness used in electrical tapes. If the plasticizer proportion is increased, the film becomes unsuitable because it makes the adhesive become soft and pasty. On the other hand, the resinous type plasticizer, if used alone in sufficient amount to impart desirable physical properties, results in the adhesive losing its tack (top of page 5). Obviously this Robertson patent does not teach applicants' discovery —first because it does not disclose their backing film, and second because it teaches nothing about the problems of pressure-sensitive tape backings."

Consolidated Electric Light Co. v. Mc-Keesport Light Co., 159 U.S. 465, 16 S. Ct. 75, 40 L.Ed. 221; Standard Brands v. National Grain Yeast Corp., 3 Cir., 101 F.2d 814, affirmed, 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17. It follows that the scope of the patent in suit is limited by its disclosure and may not be extended to cover what other investigators subsequently discovered.

In addition to the references to ethyl acrylate polymer in the specification, the fact is stressed that a resinous plasticizer is comprised of light as well as heavy molecules; and the plaintiff strongly contends that these components may be so put together that the finished product will contain a liquid as well as a resinous element and thus constitute an equivalent of the blend of two kinds of plasticizers prescribed by the patent; and it is asserted that G–25 and G–40 are plasticizers of this sort and hence their use by the defendants constitutes infringement. The defendants concede that the use of a pre-blended mixture would be equivalent to mixing the two plasticizers during the process of production. Hence the crucial inquiry is whether G–25 and G–40 actually contain a liquid as well as a resinous element.

It will be noticed that during the experimental period the patentees tried both G–25 and G–40 as a sole plasicizer and failed, but that later the defendants found that either could successfully be used alone. The plaintiff claims, however, that after 1944 the composition of G–25 was changed and that it now contains both liquid and resinous portions. In this respect the Judge made the specific finding that "Paraplex G–25, when the applicants for the patent worked with it in 1944 and 1945, was substantially different than it is today," and he added that in this earlier period the substance was in the process of development of manufacture, and that today G–25 and other polymerized plasticizers can be "tailored" to get the results which users desire. This change, the Judge suggested, explains the failure of the inventors in 1944 and the failure of Plymouth in 1948–50 to make the tape with G–25 as the sole plasticizer.

The Judge made the additional finding that by certain processes resinous plasticizers may be "fractionated" into the more viscous high-molecular-weight portions and the more liquid low-molecular-weight portions of the original materials [5]. Hence, the plaintiff contends that infringement has been established by the use of a resinous plasticizer alone, notwithstanding the seeming teaching of the patent to the contrary.

■ Our examination of the record convinces us that the findings on which this conclusion is largely based are not in accord with the great weight of the evidence. It is argued that there must have been a great change in the composition of G–25 as manufactured by Rohm and Haas because the plaintiff could not use it successfully as the sole plasticizer in 1944 and 1945, but can do so today. No comparison was offered by the plaintiff of the ingredients of the substance in the respective periods, with one exception: that, in 1944 and 1945, G–25 had a film of oil on the surface of the containers whereas no oil is observable in the plasticizer supplied by Rohm and Haas to the plaintiff today. There was however no direct testimony that the film of oil affected the manufactured article adversely—the only evidence on the point being that of the defendants' expert, that the oil would be more helpful than otherwise. Moreover, the plaintiff

5. According to the testimony of Tierney, G–40 when fractionated was found to contain 67% of the more viscous high-molecular-weight resinous portion and 33% of the more liquid lower-molecular-weight portion; G–25, 88% and 12%; ethyl acrylate polymer, 72% and 28%. The fractionation was done under Tierney's direction by a chemist who was not produced as a witness. The chemist was given no standard to follow in what should be considered the liquid and what should be the resinous portion of the fractionated material. The liquid portions produced was much more viscous than the plasticizers, such as DOP, which are known to the art as liquid plasticizers.

was unable to make the tape in 1944–45 with G–25 of its own manufacture which bore no oil film on the surface, or with G–40, as to which there is no evidence or finding of change. It is of far greater importance to note that there is positive and direct testimony on the part of Rohm and Haas, who supplied G–25 and G–40 to both parties in the pending case, that there has been no significant change in G–25 since it was first put on the market [6].

We reject also the contention that the patent teaches that the more liquid low-molecular-weight portions of a resinous plasticizer are the equivalent of a liquid plasticizer, such as DOP which, according to the patent, must be used to secure a satisfactory insulating adhesive tape. The record does not support this thesis. The evidence clearly shows that there are two well defined and distinctive types of plasticizers, as the language of the specification indicates, which are not only well recognized by the trade but are characterized by substantial differences in chemical composition. The liquid plasticizers are all monomeric, that is, they are simple, precise and well defined chemical compounds of low-molecular-weight ranging from 250 to 600. In them every molecule is like every other molecule so that the material cannot be fractioned. It is thinly fluid. DOP for example has a molecular weight of 390 and a viscosity of less than one poise, which is the unit by which viscosities are measured. Resinous plasticizers on the other hand are polymeric. They are synthetic compositions made by combin-ing chemicals of high-molecular-weight and are extremely viscous. G–25, for example, has a viscosity of 1000 poises. The molecules of these resins are combinations of varying numbers of so-called building units and accordingly vary in weight, ranging in the case of G–25 from 1000 to 50,000. Its average molecular weight is 8000. It is substantially correct to say that no part of G–25 is liquid and no part of DOP is resinous, as these terms are known to the art. Tierney himself used the terms "liquid" and "resinous" as indicative of distinct classes of plasticizers and testified that all portions of G–25 are resinous.

It may be that the lower weight molecules in the resinous plasticizers perform the function which the patent attributes to the liquid plasticizers in making the finished product with the result that both parties in the pending case now find that G–25 or G–40 may be used as the only plasticizer; but it is certain that the inventors were unaware of this fact and maintained the contrary position. On this account the patent does not cover the defendants' product and infringement is not proved. Even if it be supposed that the composition of G–25 has been so changed as to contain a larger number of molecules of relatively low weight than the G–25 produced during the experimental period, and that by reason of this change it is now possible to use resinous material as a sole plasticizer, its use in making an insulating tape would not constitute infringement, because the plasticizer would still be completely resinous whereas the patent

---

6. In response to an inquiry, Rohm and Haas made the following statements in the course of their letter of December 29, 1954, addressed to both parties in the pending case:

"* * * We normally prefer not to disclose details on the composition of our products, but we recognize that in view of the granting of this patent our customers will require considerable information on the PARAPLEX plasticizers and the differences that exist between them. We have accordingly prepared the following description of these products. We believe this description provides all the information concerning them needed

for the resolution of questions arising out of the reissue patent."
[Here follows a description of the constituents of these materials.]
"Paraplexes G–25, G–40, G–50 and G–53 are all linear polyesters of aliphatic dicarboxylic acids and glycols. * * * These four Polyesters also differ in number average molecular weight as follows:

Paraplex G–25 – 8000
Paraplex G–40 – 6000
Paraplex G–50 – 2200
Paraplex G–53 – 3380

"In each of these products no significant change has been made since it was first offered for sale."

teaches that a liquid as well as a resinous plasticizer must be used.

Little need be said about claim 6 of the reissued patent. It provides for the use of a plasticizer "comprising at least a major proportion of non-migrating viscous plasticizer resin". If this dubious phrase means that only a resinous plasticizer need be used, the claim is invalid because it goes beyond the disclosure of the original patent; if, on the other hand, the phrase means that both liquid and resinous plasticizers are to be used, the claim is not infringed by the defendants.

Reversed and remanded.