279 F.2d 409
 125 U.S.P.Q. 480
 MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation of
Delaware, Appellant,
v.
UNITED STATES RUBBER COMPANY, a corporation of New Jersey;
Lowder Hardware Company, Inc., a corporation of
North Carolina; and E. Walker Duvall,
d/b/a Rockingham Hardware
Company, Appellees.
MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation of
Delaware, Appellant,
v.
GOODYEAR TIRE AND RUBBER COMPANY, Inc., a corporation of
Delaware, and Carolina Tire Company of
Thomasville, North Carolina, Inc., a
corporation of North Carolina,
Appellees.
 Nos. 8048, 8049.
 United States Court of Appeals Fourth Circuit.
 Argued April 19, 1960.
Decided May 16, 1960.
 
 Estill E. Ezell, St. Louis, Mo. (Welch Jordan, Greensboro, N.C., Harold J. Kinney, St. Paul, Minn., Merville, K. Hobbs, Winter Park, Fla., and Charles H. Lauder, St. Paul, Minn., on brief), for appellant.
 Hector M. Holmes, Boston, Mass. (Thornton H. Brooks, Greensboro, N.C., and William W. Rymer, Jr., Boston, Mass., on brief), for appellees.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit judges.
 SOPER, Circuit Judge.
 
 
 1
 The appeals in these two cases bring before us again United States Reissue Patent No. 23,843 for an adhesive insulating tape issued to R. J. Oace and others, assignors to Minnesota Mining and Manufacturing Company, which we considered initially, and on rehearing in Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 243 F.2d 136 and 249 F.2d 66. The trial court in the earlier case had found for Minnesota on the issue of infringement based on the sale by Sears, Roebuck and Company of tape manufactured by Plymouth Rubber Company, Inc., a codefendant, which controlled the defense of the suit; but after careful consideration of the scope of the patent and of the elements of the claims, we reached the conclusion that the defendants had not infringed the patent since one of the elements of the patented structure had been omitted in the manufacture of the accused product.
 
 
 2
 On rehearing we adhered to this decision and rejected the motion of the plaintiff to send the case back to the District Judge to consider newly discovered evidence since we were of the opinion that the new evidence, if accepted, did not require a change in our decision on the issue of infringement.
 
 
 3
 The instant suits on the same patent were brought by Minnesota after the favorable decision of the District Court in Sears (Minnesota Mining & Mfg. Co. v. Sears, Roebuck & Co., D.C., 141 F.Supp. 686) but before its reversal on appeal, the suit against United States Rubber Company being instituted on June 15, 1956, and that against Goodyear Tire and Rubber Company on July 5, 1956; but the trial of the suits was stayed pending the appeal in the case against Sears. They were, however, brought to the attention of the District Judge by motion for summary judgment filed by the defendants on August 10, 1959, after our decision in the Sears case and after infringement suits on the same patent brought by Minnesota against other defendants in other sections of the country had terminated unsuccessfully.[1]
 
 
 4
 In support of the motions for summary judgments in the instant suits the defendants filed affidavits in which it was shown that the accused articles sold or used by the defendants were not manufactured by them but by Plymouth, the codefendant in charge of the defense of the suit against Sears. The affidavits further showed that the ingredients of the product sold by the defendants were the same as those used in the tape sold by Sears. Conter-affidavits were filed by Minnesota; but the District Judge, in considering the affidavits on both sides, granted the motions for summary judgment and dismissed the suits since he reached the conclusion that the affidavits raised no substantial issue of fact.
 
 
 5
 Immesota strongly contends that the summary dismissal of the instant cases was erroneous because the affidavits filed by the parties raise a genuine issue of fact as to whether the tapes sold by the defendants prior to the filing of the suits against them were substantially the same in structure as the tapes which in Sears were held not to infringe the patent. For an understanding of the point we must restate, in substance, what was decided in the Sears case in regard to the composition of the patented structure. As our first opinion points out, 243 F.2d 136, the patent specifies an adhesive insulating tape composed of a film backing mixed with a non-volatile liquid plasticizer and a soft and resinous plasticizer, together with an adhesive coating united to the inner surface of the backing. The inventor stressed the fact that the finished article would not possess the desired qualities unless both a liquid and a resinous plasticizer were used in its manufacture. The specifications expressly stated (243 F.2d 138) that, in order to secure permanent equilibrium between the backing and adhesive, it was necessary to use with the film backing a combination of modifiers, including a substantial but minor amount of a lowmolecular-weight liquid plasticizer, together with a substantially equal or somewhat greater amount of a highmolecular-weight resinous type plasticizer; and it was pointedly emphasized that the desired results could not be obtained by the use of resinous or high-molecular-weight modifiers alone. Thus it was said (243 F.2d 138, 139):
 
 
 6
 '* * * it is surprisingly found that these (resinous) materials do not provide for permanent equilibrium of adhesive and backing as herein defined. Instead, it has been shown that pressure-sensitive adhesives in prolonged contact with highly stretchable and elastic films consisting solely of vinyl polymer and resinous modifier lose a great deal, if not all, of their initial tackiness or pressure-sensitivity. When tape made in this way is unwound from roll form, after a moderate period of storage, and applied to a splice, it does not adhere either to the electrical conductor or to its own backing, and hence is of no value as an insulating and protective coating.'
 
 
 7
 Based on this disclosure, typical claim 1 of the patent declares that the patented tape is comprised of an elastic film backing formed of a homogeneous mixture consisting of a blend of (1) a major proportion of vinyl chloride, (2) a substantially non-volatile liquid phytalyl ester plasticizer, (2) a soft and viscous lowacid-number alkyd plasticizer resin in amount at least equal to the amount of the liquid plasticizer, and (4) pressuresensitive rubber resin type adhesive coating united to the inner surface of the film backing.
 
 
 8
 The event showed, however, that the patentees were in error in supposing that both kinds of plasticizers were needed in order to produce a satisfactory tape. Plymouth, experimenting in the field, found that by using only a resinous plasticizer such as G-40, or its substantial equivalent G-25, satisfactory results could be obtained and it accordinly placed a tape so made on the market which was sold by Sears and other persons who were sued by Minnesota for infringement. In the prosection of these suits, Minnesota contended that even if Plymouth used only a resinous plasticizer, its tapes, nevertheless, infringed the patent because the resinous plasticizer employed contained a substantial quantity of more liquid molecular weight material, which was the equivation of a liquid plasticizer. In our opinion we rejected this contention and stressed the significant differences between the two types of plasticizers in these words (243 F.2d 143):
 
 
 9
 'The evidence clearly shows that there are two well defined and distinctive types of plasticizers, as the language of the specification indicates, which are not only well recognized by the trade but are characterized by substantial differences in chemical composition. The liquid plasticizers are all monomeric, that is, they are simple, precise and well defined chemical compounds of lowmolecular-weight ranging from 250 to 600. In them every molecule is like every other molecule so that the material cannot be fractioned. It is thinly fluid. DOP for example has a molecular weight of 390 and a viscosity of less than one poise, which is the unit by which viscosities are measured. Resinous plasticizers on the other hand are polymeric. They are synthetic compositions made by combining chemicals of high-molecular-weight and are extremely viscous. G-25, for example, has a viscosity of 100 poises. The molecules of these resins are combinations of varying numbers of so-called building units and accordingly vary in weight, ranging in the case of G-25 from 1000 to 50,000. Its average molecular weight is 8000. It is substantially correct to say that no part of G-25 is liquid and no part of DOP is resinous, as these terms are known to the art. * * *'
 
 
 10
 Relying upon this adjudication the defendants filed the motions for summary judgment in the instant suits and supported them by affidavits to show that the Plymouth tapes sold by them were the same in structure as the tape sold by Sears in the earlier case. Danovitch, the chemist at Plymouth who set up the formulas of its tapes, Harris, the vicepresident of Plymouth in charge of manufacture, and Beavers, the chemist at Rohm and Haas, which manufactured the resinous plasticizers used by Plymouth in making its tapes, all deposed that the only plasticizers used in the manufacture of the tape involved in the Sears case were resinous plasticizers G-40 or G-25; and that Plymouth has never made or sold any tape except with one or the other of these plasticizers and that the formulas have remained the same except that more recent changes have been made in the composition in the film backing and a fire retardant has been added; and that no liquid plasticizer has ever been used.[2]
 
 
 11
 Minnesota filed counter-affidavits in opposition to the motions for summary judgment to the following effect. Rathmann, a chemist who is in charge of the Polymer Section of Minnesota's Central Research Department and performed certain work for Minnesota in connection with the trial of its case against Sears under the direction of Tierney, chief chemist for Minnesota, deposed on August 12, 1959, that about a year before he carried out an analysis of the plasticizer in a Plymouth tape, advertised by it in January 1958, as 'new' and called 'Slipknot' Plastic Electrical Tape, and found that it contained a substantial amount of nonresinous material. He said:
 
 
 12
 '* * * The plasticizer in said tape cannot properly be characterized as 'entirely resinous'. Neither can it correctly be said that 'every part and portion' of such plasticizer is of the 'resinous type'. Such plasticizer, as shown by my analysis, contains much low molecular weight material. Upwards of twenty percent of the plasticizer present in the 'Slipknot' Plastic Electrical Tape, based upon my said analysis, is not resinous; rather, it is a fluid of low molecular weight.'
 
 
 13
 Rathmann also deposed that in July 1959, he carried out an analysis of the plasticizer in a tape carrying the name of 'Superior Insulating Tape Co.', the defendant in a suit Brought by Minnesota in the Eastern District of Missouri, and found that it contained the same sort of plasticizer as the 'Slipknot' Plastic Electrical Tape.
 
 
 14
 Rathmann also deposed in a separate affidavit on October 2, 1959, that he had examined the plasticizer contained in the tape sold by the defendants in the instant cases and made the following findings:
 
 
 15
 '* * * In each case the viscosity of the plasticizer contained in such tapes is very much less than the viscosity commonly found in Paraplex G-40. The number average molecular weight of the plasticizer, as removed from the backing of each of the foregoing tapes, was of the order of half, or less, of the number average molecular weight of Paraplex G-40. A very substantial percentage of a liquid low molecular weight plasticizer, such as dioctyl phthalate, would have to be added to Paraplex G-40, as most commonly encountered in commerce, in order to reduce the intrinsic viscosity of the blend to that of the plasticizer removed from either of the aforesaid tapes of the defendants Goodyear and United States Rubber, respectively. I do not mean to infer that any dioctyl phthalate was actually used by Plymouth Rubber Company in making the tapes in question, but surmise that they processed the backing during manufacture in such a manner as to develop the low molecular weight material in the backing of the tape as the tape is actually sold on the market.'
 
 
 16
 Kinney, who has appeared as an attorney for Minnesota in other jurisidictions in cases involving the Oace patent and is of counsel for Minnesota in the instant cases and is a chemical engineering graduate, deposed in an affidavit filed on Minnesota's behalf substantially as follows:
 
 
 17
 '* * * I am advised and believe, and state the fact to be, that most, if not all, of the tapes which have been made by Plymouth Rubber Company and sold under its own brand or under the names of U.S. Rubber Company, Goodyear Tire & Rubber Company, Superior Insulating Tape Company, St. Louis, or other, from December 1955 to the present time, have been made starting with a plasticizer comprising Paraplex G-40, but that the plasticizer in the said tape as sold contains much liquid, low molecular weight material not contained in Paraplex G-40 as it commonly occurs in the market.'
 
 
 18
 Kinney further deposed that he believed the statements and allegations contained in the Rathmann affidavit of August 12, 1958, and he added:
 
 
 19
 'According to the published advertising of Plymouth Rubber Company, Inc., it has changed its plastic tape significantly at least once since the conclusion of the former trial in November of 1955. The tape which has recently been sold by the defendants U.S. Rubber Company and Goodyear Tire and Rubber Co., and made for them by Plymouth Rubber Company, Inc., I am advised, has a substantial content of liquid nonresinous material in the plasticizer: see the attached affidavit of Dr. Rathmann, filed in the Superior case. If the tapes which have recently been made by Plymouth and supplied to the defendants Goodyear and U.S. Rubber are similar to the tapes which Plymouth made for them during the several months between December, 1955, and the commencement of each of the above actions, then the tapes made in that period are likewise, I am advised, tapes in which the plasticizer contains a substantial proportion of liquid non-resinous material. We will expect to prove up the nature of the plasticizers in such tapes at the trial of these cases.'
 
 
 20
 In a subsequent affidavit filed on December 27, 1959, Kinney deposed as follows:
 
 
 21
 'At the trial of these actions, if plaintiff is given the opportunity to try them, plaintiff expects to prove that vinyl plastic tape sold in this country by United States Rubber in the year 1956, prior to June 15, 1956, branded 'Royalastic' Plastic Electrical Tape, and containing the name 'United States Rubber Company, New York, N.Y.' has a plasticizer in the backing having a viscosity very much less than the viscosities commonly found in Paragraph G-40, (Paraplex G-40) and of the order of viscosity attained by adding a substantial percentage of a low molecular weight liquid, such as dioctyl phthalate, to Paraplex G-40; and also to prove that such plasticizer contains a substantial percentage of liquid non-resinous material. Plaintiff expects to make similar proofs, if given the opportunity in respect to 'Goodyear' Plastic Automotive Tape, sold in this country by Goodyear Tire & Rubber Company, Inc. in the year 1956, prior to June 5, 1956.'
 
 
 22
 It may seem upon a superficial reading, that the Minnesota affidavits create an issue of fact that should be resolved in a plenary trial; but when the carefully chosen language of the affiants is examined it becomes clear at once that their testimony amounts to nothing more than an attempt to reopen a controversy that has already been decided after prolonged litigation. The motions for summary judgment rest upon the positive assertion in the affidavits of the defendants that Plymouth used no liquid plasticizer in the tapes sold by them, and thus it has been apparent to Minnesota from the beginning, in view of the Sears decision, that it could not hope to succeed in the present controversy unless this allegation was denied and a genuine issue of fact was created. The question for our decision is whether the broad and general statements in the plaintiff's affidavits accomplish this purpose. In our opinion, they do not. Certainly the 'Slipknot' advertisement published in January, 1958, which describes in general terms the virtues of Plymouth's 'new' product without disclosing its constituents, does not of itself tend to show that the tapes sold by the defendants prior to the institution of the suits against them in June and July, 1956, contained a liquid plasticizer. Minnesota attempts to bridge this gap by accepting the statements of Plymouth's affiants that its formulas have remained the same since the Sears case and by showing through analysis that Plymouth's more recent tapes contain the liquid element. The significant fact is, however, that Rathmann, who made the only chemical analysis offered by the plaintiff, did not venture to say that he found a liquid plasticizer in the defendants' merchandise. With great care he avoids the use of the distinctive term 'liquid plasticizer' and swears only that the plasticizer in the tape is not entirely resinous but contains much 'fluid' low-molecular-weight material. He says that he does not mean to infer that any dioctyl phthalate-- the liquid plasticizer described in the specifications of the Oace patent-- was used by Plymouth, but he surmises that in the process of manufacture Plymouth has been able to develop a low-molecular-weight material. Obviously this is not enough. The molecular weights vary in both kinds of plasticizers but each has its own distinctive form, the liquid plasticizer being monomeric and the resinous plasticizer polymeric in its molecular structure, and it follows that Plymouth's tape did not violate the patent even if it be true, as Rathmann suggests, that Pymouth has found a way to make a satisfactory tape by using a resinous plasticizer containing a substantial amount of law-molecular-weight material. If it had been possible for Rathmann to testify that he found a 'liquid' plasticizer in his analysis, he would doubtless have used the precise term in his report and the adroit substitution of the word 'fluid' would have been unnecessary. In this connection, the term 'fluid' had little or no significance, for viscous material is aptly described as fluid, although it flows slowly.
 
 
 23
 The Kinney affidavit adds no weight to the plaintiff's position. Aside from its impropriety as an effort on the part of an attorney to bolster his client's case by giving factual testimony on his client's behalf, the affidavit is obviously based only on information and belief derived from Rathmann and does not represent the testimony of one who has personal knowledge of the essential facts.
 
 
 24
 Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., which governs the course to be followed when a party seeks a summary judgment, provides in paragraph (c) that the judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law; and in paragraph (e) that supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein.
 
 
 25
 The procedure outlined provides a salutary and efficient instrumentality for the expedition of the business of the courts especially where, as in the pending cases, the merits on controversy have been fully explored in prior litigation between the same parties. It is of course imperative that the procedure be not availed of as a device to prevent a full examination of the underlying contested facts, for such an attempt not only deprives the opposing party of his rights but usually results in prolonging rather than shortening the litigation; and we have in the past disapproved such a course of conduct. Stevens v. Howard D. Johnson Co., 4 Cir., 181 F.2d 390, 394. The precautions to be taken in applying the rule and the banefits to be derived therefrom are well set forth in Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 261 F.2d 428, 432, as follows:
 
 
 26
 'As might be expected of anything so useful, there is a definite condition on its availability, a restriction on its use. No matter how enticing, it cannot short circuit a trial by judge or jury of fact questions if they are really in the case. If, on the moving papers alone or on them in conjunction with the counter affidavits it is shown that there actually is a genuine dispute of a significant fact, * * * or there is a serious and substantial doubt about it, * * * summary judgment must be denied. But if, on the other hand, there is, by a presentation of factual evidentiary details having the substantial characteristics of receivable evidence as compared with conclusions, a convincing showing that no real genuine controversy on the decisive fact exists, a mere formal denial is but a pretended one, and is insufficient. In the situation the respondent spondent must come forward with facts of his own. * * * These mutual principles assure both the fullest utility to this procedural device while keeping it from ever becoming a mere wager of affidavits, a compurgation by the most paper swearers.'
 
 
 27
 In accord with this statement are Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715; James v. Honaker Drilling, Inc., 10 Cir., 254 F.2d 702, 706. In the application of the rule it is held that mere denials unaccompanied by facts which would be admissible in evidence at a hearing are not sufficient to raise a genuine issue of fact, Piantadosi v. Loew's, Inc., 9 Cir., 137 F.2d 534, 536; and that the affidavit of counsel based upon hearsay and not upon personal knowledge does not satisfy the requirements of the rule, Chapman v. United States, 8 Cir., 139 F.2d 327. The District Judge correctly applied the rule, as illuminated by these decisions, in granting the motions for summary judgments in the pending cases.
 
 
 28
 The cases now before us call for the application of the rule laid down in Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065, where it was held that a patentee who has been unsuccessful in a patent infringement suit against a manufacturer may be restrained from interfering with the business of the defendant by prosecuting other infringement suits on the same patent against the defendants' customers. We meet this situation on this appeal since Minnesota is now seeking to prohibit the defendants from using the products of Plymouth on the same grounds as were found insufficient in the case against Sears. We are therefore in general accord with the decision below, but we think that a restriction contained in the judgment upon the right of Minnesota to institute appropriate suits against the defendants in the future should be eliminated. The summary judgment of dismissal was entered 'without prejudice against the plaintiff's right to institute an appropriate suit against the defendants which may have arisen since October, 1957, regarding the production or sale of an infringed product of the Oace patent.' The decision of this court overruling the motion for reargument in the Sears case was entered in October, 1957, and from this fact it was doubtless inferred that the judgment in that case covered not only actions of the defendants prior to the institution of the suit on August 3, 1954, but subsequent actions of the defendants in the interval between the institution of the suit and the final judgment of this court. There was indeed some discussion in our second opinion of the charge that Plymouth altered its formula after the institution of the suit against Sears and we held that even if the charges were sustained there would be no showing of infringement; but our judgment was limited in its effect to the dismissal of the charge of infringement by the defendants prior to the institution of the suit on August 3, 1954.
 
 
 29
 The judgment of the District Court will therefore be modified by eliminating the restrictive words quoted above and as modified will be affirmed.
 
 
 30
 Modified and affirmed.
 
 
 
 [1]
 On August 4, 1954, the day after the institution of the suit against Sears, Minnesota brought suit on the patent in the United States District Court for the Northern District of Illinois against Plymouth and certain of its Chicago customers. After the judgment of dismissal was finally entered in the Sears case, Plymouth filed a motion for summary judgment of dismissal in the Chicago case, accompanied by affidavits similar to those in the instant cases. The motion was granted and no appeal was taken. See Minnesota Mining & Mfg. Co. v. Plymouth Rubber Co., D.C., 178 F.Supp. 591
 On August 4, 1954, Minnesota also entered suit on the patent in the United States District Court for the Eastern District of Missouri against the Superior Insulating Tape Company, which was defended by Plymouth. On June 8, 1958, after the decision in the Sears case, the defendant filed a motion for summary judgment, accompanied by affidavits similar to those in the pending cases. On August 10, 1959, Minnesota filed a motion for leave to file a supplementary complaint. After consideration the court denied plaintiff's motion and granted the defendant's motion for summary judgment. 178 F.Supp. 591.
 In December, 1958, Plymouth filed a declaratory judgment suit against Minnesota in the United States District Court for Massachusetts seeking an adjudication that the 'Slipknot' tape of Plymouth Rubber Company did not infringe the Oace patent, to which suit Minnesota filed a counterclaim for infringement. The suit is still pending.
 
 
 [2]
 Danovitch and Beavers gave substantially the same testimony in depositions taken at the instance of Minnesota in the St. Louis and Massachusetts cases