**PLYMOUTH RUBBER COMPANY, Inc.,**
**Plaintiff,**

v.

**MINNESOTA MINING AND MANUFAC-**
**TURING COMPANY, Defendant.**
Civ. A. No. 58–1222.

United States District Court
D. Massachusetts.
March 23, 1962.

Hector M. Holmes, H. L. Kirkpatrick and Eber T. LeGates, Boston, Mass., for plaintiff.

John M. Harrington, Boston, Mass., Edward A. Haight, Chicago, Ill., and Harold J. Kinney, St. Paul, Minn., for defendant.

CAFFREY, District Judge.

This is an action brought under 28 U.S.C.A. §§ 2201, 2202, in which Plymouth Rubber Company, Inc. seeks declaratory relief against Minnesota Mining and Manufacturing Company. Plaintiff seeks a determination that Minnesota's Oace Reissue Patent, No. 23,843, is not infringed by "Slipknot," plastic electrical insulating tape manufactured and sold by Plymouth, and, also, requests an injunction against Minnesota's bringing or threatening to bring any additional suits against Plymouth or any of its customers based on the manufacture, use, or sale of Slipknot tape by Plymouth or by any of its customers.

In its answer Minnesota asserts that its Oace patent was duly and lawfully issued, is valid, and that Plymouth has infringed and is continuing to infringe same. Minnesota also says that the tape in issue here is different from a tape previously determined to be non-infringing in earlier litigation between the same parties which resulted in the entry of a judgment in Plymouth's favor with respect to the tape there in issue.

Minnesota's answer also includes a counterclaim against Plymouth, a prayer for an accounting to establish Minnesota's damages resulting from the alleged infringement, and a prayer for a permanent injunction restraining Plymouth from further infringement.

■■ Plymouth filed a reply to Minnesota's counterclaim in which it challenges the validity of the reissue patent. Thereafter, Judge McCarthy allowed Minnesota's motion to strike so much of Plymouth's reply to the counterclaim as put in issue the validity of the Oace reissue patent, on the ground that the patent had been held to be valid in an earlier case. (See D.C., 185 F.Supp. 716.) At the trial of this case I declined to review Judge McCarthy's allowance of the motion to strike, despite urgings of Plymouth's counsel that I do so, since I am persuaded that it is not the proper function of one district judge to review rulings made by another member of the same Court at an earlier stage of a pending case. Any rights that Plymouth may have by reason of my declining to recon-

sider this matter are expressly saved for purposes of appeal.

At the trial each party produced several chemical experts, all duly qualified to express opinions on the various chemical problems presented by this case. Because of the extensive litigation which has already taken place between these two parties with respect to this particular patent, I do not find it necessary to analyze this expert testimony in fine detail or at length.

For present purposes the most important case in this litany of litigation [1] is the so-called "Sears" case, which was filed on August 3, 1954, by Minnesota against Sears, Roebuck & Company, in the Middle District of North Carolina. Plymouth intervened in that case and openly and actively defended on behalf of its customer, Sears, Roebuck. The District Court ruled that Minnesota's Oace patent was valid and was infringed by the tape which Plymouth was making at that time. Its opinion is reported in Minnesota Mining & Mfg. Co. v. Sears, Roebuck & Co., D.C., 141 F.Supp. 686. On appeal the Court of Appeals for the Fourth Circuit, in an opinion dated April 1, 1957 (243 F.2d 136), reversed and vacated the judgment of the District Court. Thereafter, on October 18, 1957, Minnesota's petition for reopening and rehearing was denied (4 Cir., 249 F.2d 66), certiorari was denied (355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415), and a motion for rehearing the petition for certiorari was denied on March 17, 1958 (356 U.S. 915, 78 S.Ct. 668, 2 L.Ed.2d 587). Final judgment was entered by the District Court on May 22, 1958, dismissing Minnesota's complaint.

The Court of Appeals for the Fourth Circuit found the Oace patent teaches that a liquid plasticizer must be used together with a resinous plasticizer, such as G–25 or G–40, in order to obtain good results in the manufacture of insulating adhesive tape. The Court specifically rejected the contention made by Minnesota that this patent teaches that the low molecular-weight portions of a resinous plasticizer are equivalent to those of a liquid plasticizer, and ruled that since Plymouth omitted from the production of its tapes the liquid plasticizer element, as specified in the claims of the patent, there could be no infringement of the patent even though the same results were obtained. The Court refused to apply the doctrine of equivalents because it was satisfied that one element required by the Oace patent, namely the liquid plasticizer, was not included in Plymouth's product.

In still another phase of this apparently interminable multi-facet litigation, the Court of Appeals for the Eighth Circuit, 249 F.2d 66, 243 F.2d 136, construed the Sears decision as holding that "plaintiff's patent teaches that the plasticizer of the

---

1. In addition to the Sears case, the following cases are among those which have been reported:

Minnesota Mining & Mfg. Co. v. Plymouth (and Hawkins Electric Company, Complete Electrical Supply Co., and Shumway-Fresen Co.), 178 F.Supp. 591 (N.D.Ill., March 27, 1959); (complaint, filed Aug. 4, 1954, dismissed on Plymouth's motion for summary judgment, and Minnesota's motion for leave to file a supplementary complaint denied);

Minnesota Mining & Mfg. Co. v. Superior Insulating Tape Co., 124 P.Q. 31 (E.D.Mo.), aff'd. 284 F.2d 478 (8 Cir., Dec. 1, 1960), (complaint, filed Aug. 4, 1954, dismissed on defendant's motion for summary judgment, and Minnesota's motion for leave to file a supplementary complaint denied);

Minnesota Mining & Mfg. Co. v. U. S. Rubber Co. (and Lowder Hardware Co. and Rockingham Hardware Co.), and v. Goodyear Tire & Rubber Co. (and Carolina Tire Co. of Thomasville, N. C.), 178 F.Supp. 385 (M.D.N.C.), aff'd 279 F. 2d 409 (4 Cir., May 16, 1960), (complaints, filed June 15 and July 5, 1956, dismissed on Plymouth's motions for summary judgment, and Minnesota's motion for leave to file a supplementary complaint denied).

Minnesota also secured default judgment against Pine State Electric Supply Co. on complaint filed in M.D.N.C. August 3, 1954. Plymouth was not a party to this case, which involved two tapes, only one of which was made by Plymouth.

tape must consist of two elements, one liquid and one resinous, and that the Plymouth product did not infringe because its plasticizer contained only the resinous element and not the liquid element."

Minnesota contends herein that Slipknot is a different tape from that involved in the Sears case and that Slipknot infringes the Oace reissue patent because of an alleged change in the composition of G–25 and G–40. Minnesota says that subsequent to August 3, 1954, G–25 and G–40 have been materially changed so that they now contain, in effect, the elements of a liquid plasticizer as that term is used in the Oace patent. Minnesota does not attempt to prove this by any direct evidence tending to establish a change in the raw materials from which G–25 and G–40 are manufactured, nor by any direct evidence of a change in the process used to manufacture G–25 and G–40. Minnesota seeks to prove that a change occurred by offering in evidence the results of certain fractionation tests made by its experts upon substances extracted by these experts from samples of Slipknot tape.

I am persuaded and accordingly I find that Plymouth's Slipknot tape, brought onto the market under that trade name in December 1957, is made in the same way and from the same materials as the Plymouth tape ruled to be noninfringing by the Court of Appeals for the Fourth Circuit in the Sears case. I base this finding primarily, but by no means exclusively, on the testimony of Dr. Ellington M. Beavers, Assistant Director of Research for Rohm & Haas Company, the chemical concern which manufactures Paraplex G–25 and Paraplex G–40. Dr. Beavers took part in the development of G–25 and G–40. He testified that prior to the commercial marketing of either of these resinous polymeric plasticizers, definite specifications were developed for the manufacture of each, and he testified explicitly that there has been no change in the specifications of G–25 since August 3, 1954, and that there have been no significant changes in the manufacturing processes of either plasticizer since that time.[2]

He further testified that the acid number specification has remained a maximum of 2 for each product; that the raw materials used for each have remained the same; that the production control methods have remained the same; that the products have continued to be as uniform as is possible; and that Rohm & Haas Company is selling today[3] the same products as G–25 and G–40 as it did on or before August 3, 1954.

Dr. Beavers' testimony was followed by testimony from Morris M. Danovitch, Chief Chemist for Plymouth's tape and cable division, to the effect that he was responsible for the formulation of Plymouth's plastic electrical tape. He stated, in substance, that there had been no change in Plymouth's method of manufacture since prior to August 3, 1954. He further testified that all formulas specify that G–40 or G–25 be used as the sole plasticizer in the manufacture of Slipknot tape. This witness was followed by Solomon C. DeJong, foreman of Plymouth's calendar room, who testified that the materials used in the actual making of Slipknot were mixed in strict accordance with Danovitch's formulas.

The testimony of these three witnesses, which dealt directly with the manufacturing and supplying of G–25 and G–40 by Rohm & Haas Company, and the manufacturing of Slipknot tape by Plymouth, was corroborated by evidence from the experimental field. Plymouth produced as its expert Mr. John M. DeBell, who has an impressive background and vast experience in the field of synthetic resins and plastics (indeed, this statement might

---

2. This testimony is corroborated in part by Defendant's Exhibit A, a letter written on December 29, 1954 on behalf of Rohm & Haas Company, in which it was stated that there has been no significant change in these resinous plasticizers.

3. March 10, 1961 was the date of this testimony.

fairly be made with reference to all the chemical experts who testified at the trial). Mr. DeBell, a former director of research at the Massachusetts Institute of Technology, now is the head of his own consulting laboratory, DeBell & Richardson, which employs over one hundred people and which does extensive consultation and testing work for the major companies in the chemical industry in the United States. He tested both the tape involved in the Sears case and the tape involved in this case, and he previously testified as Plymouth's expert during the trial of the Sears case. Mr. De-Bell stated that his laboratory tests indicated no change in the plasticizer used by Plymouth in the two tapes tested. His tests showed the absence of a liquid plasticizer.

I believe these witnesses, both because they impressed me as credible and truthful witnesses and because there was no direct challenge to their testimony as to continued identity of raw materials and manufacturing processes. Minnesota's evidence consisted mostly of the results of certain experimental tests conducted by its chemical experts. I do not believe these tests go far enough to require the disbelief of any of the foregoing testimony. The so-called fractionation tests are similar to those upon which Minnesota relied in its motion for rehearing in the Sears case and in its motions for leave to file supplementary complaints in other cases cited in footnote No. 1, supra.

Minnesota claims the tests show that the low molecular weight fractions of the plasticizer extracted from the backing of Slipknot tape is such as to be either a liquid plasticizer similar to that called for by its Oace patent or sufficiently similar to be an equivalent to it. This is essentially the same argument which Minnesota presented to the Court of Appeals for the Fourth Circuit when it sought reopening of the Sears case. That Court specifically rejected this argument by saying:

"* * * even if the new evidence should demonstrate the alleged change in the composition of G–25, the decision of the Court would necessarily be retained. This is so because G–25, although changed to contain a larger quantity of low molecular weights, would nevertheless be a resinous plasticizer and would not be composed partly of a resinous and partly of a liquid plasticizer in accordance with the teaching of the patent." (249 F.2d 66, 67.)

I, likewise, do not find sufficient merit in the argument presented by Minnesota here to overcome the plaintiff's evidence.

I think it significant that all of Minnesota's experts avoided the use of a distillation test which Mr. DeBell testified was a simple, reliable and objective test for determining the presence of liquid plasticizer, the ingredient which the Court of Appeals for the Fourth Circuit held to be an indispensable element under the teachings of the Oace patent.

Minnesota makes the further contention that when Plymouth brought Slipknot on to the market in 1957 it launched an extensive nationwide advertising campaign heralding Slipknot as its "new" tape. Minnesota says that this advertising should be treated by this Court as an admission that Slipknot was a "different" tape from that sold by Plymouth prior to 1957, and on the basis of the chemical evidence in the case, Minnesota argues that this "different" tape should be found to be an infringing tape. Plymouth, on the other hand, says that the tape was "new" in the sense that the nationwide advertising program would introduce it to a group of customers 95% of whom were previously unaware that Plymouth manufactured and marketed a plastic electrical insulating tape, that for this reason it was "new" to this 95% of the trade, and that it was also "new" in that the thickness of the particular tape involved had been reduced from 8 to 7 mil.

The evidence shows that Plymouth conducted an elaborate advertising campaign as alleged, and also used the catch line

"ZF–90 for total adhesion." This may well have been over-promotion with regard to the degree of newness, and could well be criticized as rather shabby hucksterism on the part of Plymouth's sales promotion personnel. Nevertheless, the use of mysterious and technical-sounding letter-number combinations for supposedly potent ingredients in a wide diversity of products is a matter of everyday experience.[4] This use of over-exuberant advertising fails to overcome the evidence reviewed in earlier portions of this opinion which satisfies me that the tape involved herein is chemically not different from the tape involved in the Sears case.

■ I find that Plymouth's Slipknot tape is made from the same materials and in the same manner as the tape held to be non-infringing by the Court of Appeals for the Fourth Circuit in the Sears case, and I rule that Slipknot does not infringe Oace Reissue Patent, No. 23,843.

■ There remain two questions, the first of which is whether Plymouth should be granted the injunctive relief it seeks. In the leading case in this area of the law, Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065 (1907), wherein the Supreme Court upheld the granting of an injunction against further suits sought by a party who previously had successfully resisted a charge of patent infringement, the Court said (at page 289, 27 S.Ct. 613, 51 L.Ed. 1065):

" * * * the question here is whether, by bringing a suit against one of Kessler's customers, Eldred has violated the right of Kessler. The effect which may reasonably be anticipated of harassing the purchasers of Kessler's manufactures by claims for damages on account of the use of them, would be to diminish

Kessler's opportunities for sale. *No one wishes to buy anything, if with it he must buy a lawsuit.* * * * If rights between litigants are once established by the final judgment of a court of competent jurisdiction, those rights must be recognized in every way, and wherever the judgment is entitled to respect, by those who are bound by it." (Emphasis added.)

The language in plaintiff's brief (page 12) aptly describes the instant litigation:

"The customer cases constitute a story of proliferation of litigation on a single issue, abuse of judicial process, persistent trying of identical issues in different courts, and oppression and harassment unequalled in our experience. We know of nothing quite like it in the reported cases."

Apart from the instant case, which was begun by Plymouth, Minnesota has thus far instigated litigation against Plymouth and 13 of its customers in United States District Courts located in the Fourth, Seventh, and Eighth Circuits. Minnesota has been unsuccessful in every one of these cases in which Plymouth has appeared and defended. Its conduct in connection with this litigation has already been criticized by the Courts of Appeal for the Fourth and Eighth Circuits. The Fourth Circuit Court criticized the conduct of one Harold J. Kinney, an attorney for Minnesota, who has appeared in substantially all of these cases, observing, with reference to an affidavit filed by Mr. Kinney in connection with the U. S. Rubber case:

"The Kinney affidavit adds no weight to the plaintiff's position. Aside from its impropriety as an effort on the part of an attorney to bolster his client's case by giving factual testimony on his client's be-

4. A casual reading of the advertising material in the daily papers in any metropolitan area or in any of our national magazines will show that the admen of Madison Avenue are saturating advertising copy with such items as GL–70 and BR–85 in toothpaste, TCP in motor oil, V–7 and VO–5 in hair tonic, AT–7 in soap, etc., etc.

half, the affidavit is obviously based only on information and belief derived from Rathmann, and does not represent the testimony of one who has personal knowledge of the essential facts." (279 F.2d 409, 415.)

The Court of Appeals for the Eighth Circuit expressed its impatience with Minnesota's behavior in the Superior Insulating Tape case, saying:

> "The record here also shows that the trial of this case was stayed for some four years upon plaintiff's (Minnesota) motion representing that the pending North Carolina cases would dispose of the controversy without the necessity of a trial. * * * There is reason to believe that there should be some limit to the number of times the courts should be required to consider claims involving identical issues." (284 F.2d 478, 482.)

Needless to say, Minnesota has not abided by the outcome of the North Carolina litigation. The conduct of Minnesota with reference to the multitudinous actions it has filed in connection with its Oace patent can be accurately characterized by the language of Judge Kaufman in Helene Curtis Industries v. Sales Affiliates, D.C., 105 F.Supp. 886, 902, aff'd. 199 F.2d 732 (2 Cir.1952):

> "[Defendant] is forum shopping with a vengeance. I discern no other rationale which can adequately explain the strategems which it has employed throughout this controversy. *Our courts are not meant for such use.*" (Emphasis added.)

While a final judgment completely disposing of this case will not be entered simultaneously with the filing of this opinion, for reasons set forth in the succeeding paragraph, a temporary injunction pending entry of final judgment will be filed herewith enjoining Minnesota, its attorneys, agents, and employees, from instituting any further or additional litigation against Plymouth or any of its distributors or customers based on alleged infringement of Oace Reissue Patent, No. 23,843, by Plymouth's Slipknot tape.

█ The final question raised by the pleadings is whether or not an attorney's fee should be awarded to Plymouth. It is clear, under 35 U.S.C.A. § 285, that an attorney's fee is to be awarded only in the exceptional case. Exceptional cases, for purposes of Section 285, are those in which the conduct of the party against whom attorney fees are awarded may be characterized as unfair or vexatious or involving bad faith or some other equitable consideration which makes it unjust that the prevailing party be left to bear the burden of his own counsel fees, which prevailing litigants normally do bear. Seismograph Service Corp. v. Offshore Raydist, Inc., 263 F.2d 5, 24 (5 Cir. 1958); Kemart Corp. v. Printing Arts Research Laboratories, 269 F.2d 375, 394 (9 Cir.1959). Cf. Grant Paper Box Company v. Russell Box Company, 106 F.Supp. 616 (D.Mass.1952), aff'd. 203 F.2d 177, cert. denied 346 U.S. 821, 74 S.Ct. 37, 98 L.Ed. 347, rehearing denied 346 U.S. 905, 74 S.Ct. 216, 98 L.Ed. 404.

█ I find and rule that the conduct of Minnesota in this case, in which it again is unsuccessfully asserting contentions rejected many times previously by other Federal courts, is both vexatious and unfair, and I award attorney fees to Plymouth. I will hear the parties on the question of the amount of attorney fees to be awarded to counsel for Plymouth.

Minnesota's counterclaim is dismissed and Plymouth will be granted relief in accordance with this opinion.