**MINNESOTA MINING AND MANUFACTURING COMPANY, a Corporation of Delaware, Plaintiff,**

v.

**SEARS, ROEBUCK AND COMPANY, a Corporation of New York, Defendant,**

and

**Plymouth Rubber Company, Inc., Defendant-Intervenor.**

No. 876–G.

United States District Court
M. D. North Carolina,
Greensboro Division.
June 4, 1956.

Welch Jordon, Greensboro, N. C., Lawerence C. Kingsland, St. Louis, Mo., Estill E. Ezell, St. Louis, Mo., Harold J. Kinney, St. Paul, Minn., M. K. Hobbs, Platteville, Wis., for plaintiff.

Brooks, McLendon, Brim & Holderness, Greensboro, N. C., Fish, Richardson & Neave, Boston, Mass., for defendant.

HAYES, District Judge.

This infringement suit is brought by the assignee of a patent on a pressure-sensitive stretchable and retractable vinyl plastic tape primarily for use as an electrical insulating tape. The original application was filed by Oace, Snell and Eastwold January 12, 1946 and patent 2,559,990 issued July 10, 1951, naming them as assignors to the Minnesota Mining and Manufacturing Co. For convenience it will be referred to as the Oace Patent. Also involved is Reissue Patent 23,843 of June 29, 1954, on application filed July 9, 1952. All available defenses are asserted.

Prior to the Oace invention, great difficulties with conventional methods of splicing electric conductors had been encountered, among others, the bulky and cumbersome and time consuming element in making splices; the materials available were ineffective under temperature changes of heat and moisture; the loss of tackiness (adhesiveness) and by becoming soft and pasty, resulting, in the tape then in use, in loosening and becoming ineffective. Slight increases in temperature above normal room temperature increased this tendency to impair the effectiveness of the splicing material with the consequent grave hazards of escaping voltage.

The Oace invention overcame these and other defects by providing an insulated spliced electrical conductor which is "electrically, mechanically and chemically effective" and is readily and quickly prepared without use of special procedures or equipment. These results were obtained by the use of an insulating tape in the form of a relatively thick but easily stretchable and highly elastic pressure-sensitive adhesive tape comprising a well-bonded, water-insoluble, non-corrosive, normally tacky and pressure-sensitive adhesive coating on a plasticized vinyl chloride polymer film which is in permanent equilibrium with the adhesive; it neither softens nor loses its adhering qualities on prolonged contact with the backing or film layer.

Oace found that high molecular weight modifier such as "Paraplex G-25" would produce the desired strength, stretch and elasticity in vinyl chloride polymer films, though classed as "nonmigrating" or "permanent" plasticizers, failed to provide for permanent equilibrium of adhesive and backing. When tape made in that manner was unwound from the roll, after a moderate period of storage it would not adhere either to the electrical conductor or to its own backing, and was of no value as an insulating and protective coating. Oace provided an electrical insulating tape having stretch and elasticity rendering it highly effective for wrapping wire and cable splices. It was

stretchable to the extent of 50% at room temperature, by mere pulling with the hands; it could be stretched 30% at room temperature and would retract to substantially its original length. He discovered how to overcome moisture and temperature destruction and to prevent loss of adhesiveness due to migration. He gave examples of insulating tapes in the form of pressure-sensitive adhesive tapes having a vinyl polymer film base prepared with a vinyl chloride vinyl acetate copolymer softening at about 280 degrees F. and in the ratio of vinyl chloride to vinyl acetate of approximately 89:-11. After giving many examples, he finds that the plasticizer must be compatible with the vinyl polymer, and must be sufficiently low in volatility so that it is not driven off during milling and calendering, or during subsequent storage and use.

After citing five examples of the various embodiments of his invention, for purposes of illustration rather than limitation, he makes the five claims set out in the margin.[1]

The re-issue copies all contained in the original patent, and adds claims 6, 7, 8, and 9 to the five of the original patent. Claim 6 typical of the others is cited in the margin.[2]

**1.** 1. A pressure-sensitive adhesive insulating tape wound upon itself in roll form and comprised of: a stretchable and elastic film backing having a thickness of 4 to 20 mils and formed of a homogeneous mixture primarily consisting of a stable blend of a film-forming polymer of monomers including at least a major proportion of vinyl chloride, a substantially non-volatile liquid phthalyl ester plasticizer amounting to 8 to 20 parts per 100 parts of said polymer, and a soft and viscous low-acid number alkyd plasticizer resin in amount at least equal to the amount of said liquid phthalyl ester plasticizer, the total amount of said plasticizers about being ⅓ to ½ the amount of said polymer and the proportions being such that the adhesive tape has the properties of stretch and elasticity hereafter specified without causing pastiness or tack-loss of the contracting adhesive in the roll; and a eucohesive normally tacky and pressure-sensitive rubber-resin type adhesive coating united to the inner face of said film backing; said adhesive tape being unwindable without delamination or offsetting of adhesive, being originally stretchable by hand-pulling to an extent of at least 50% at room temperature and being substantially completely retractable from an elongation of 30% as herein specified.

2. An adhesive tape according to claim 1, wherein the adhesive includes a small proportion of an oil-soluble heat-reactive phenol-aldehyde resin.

3. An adhesive tape according to claim 1 in which the film forming polymer is a copolymer of vinyl chloride and a minor proportion of vinyl acetate, said copolymer having a softening temperature of at least about 280 degrees C.

4. A pressure sensitive adhesive insulating tape wound upon itself in roll form and comprised of: (1) a stretchable and elastic film backing having a thickness of 4 to 10 mills and formed of a homogeneous mixture primarily consisting of a stable blend of 70 parts of a copolymer of vinyl chloride and a minor proportion of vinyl acetate, about 10 parts of a substantially non-volatile liquid phthalyl ester plasticizer, and about 20 parts of a soft and viscous low-acid-number alkyd plasticizer resin; (2) an adhesive primer coating on the inside face of the film backing adapted to increase the anchorage of the adhesive coating; and (3) a eucohesive normally tacky and pressure sensitive rubber-resin type adhesive coating bonded to said primer coating; and said adhesive tape being unwindable without delamination or offsetting of adhesive being originally stretchable to an extent of at least 100% at room temperature and being substantially completely retractable from an elongation of 30% as herein specified.

5. An adhesive tape according to claim 4, wherein the adhesive includes a small proportion of an oil-soluble heat-reactive phenol-aldehyde resin.

**2.** 6. A pressure-sensitive adhesive insulating tape wound upon itself in roll form and comprising: (1) a water-insoluble and hydrocarbon-oil-insoluble film backing of high dielectric strength containing a stabilizer and having a thickness of 4–20 mils and formed of a homogeneous mixture primarily consisting of a stable blend of (a) a film-forming polymer of monomers including at least a major proportion of vinyl chloride, and (b) a substantially non-volatile plasticizing material therefor in an amount within the range of at least 1/3 the weight of said polymer but in a substantially lesser

The specification of the reissue is the same as the original patent except comment on the novelty of the tape and definition of terms. There are no additional disclosures of a tape or how to make it. The claims of the reissue appear to embody nothing not disclosed in the original application and invention and they do not broaden the disclosures of the original patent but are further descriptive or illustrative of the teachings of the original patent. The recent case in the Fourth Circuit of Florence-Mayo Nuway Co. v. Hardy, 168 F.2d 778, appears to state the principles of law applicable to the instant case. Applying the principles of law so ably stated by Judge Parker in Colgate-Palmolive Co. v. Carter Products, Inc., 4 Cir., 230 F.2d 855, to the facts in this case, we conclude that the patent is valid. The instant case and the Palmolive case above are not in conflict with the opinion in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

Much of the controversy here arises from the employment of Paraplex G–25 as one of the ingredients in the production of the tape by the plaintiff and by the defendants in the accused tapes.

It is perfectly clear that the Paraplex G–25, when the application for the original patent was filed, was of a substantially different formula than that of its later or subsequent vintage. This old formula of Paraplex G–25, in part, accounted for the defects of the tape which became manifest from the exposure, change of moisture or temperature or from storage. The problem was to discover what to do to solve these difficulties. Oace discovered and taught how Paraplex G–25 could not be used alone but the combinations with it which would add to the equilibrium of the tape and vastly prolong its usefulness and efficiency, and how to eliminate migration. The evidence abundantly shows that the subsequent vintage of Paraplex G–25 was altered and tailored so that, in a large measure, it overcame the migration. But the alteration of Paraplex G–25 which in its new vintage included the old vintage of Paraplex G–25 and the chemical product which plaintiffs discovered necessary to use in combination to solve the problem, does not invalidate the patent or excuse the defendants from infringement.

If it be granted that there was novelty in the chemical combination which resulted in a non-migrating adhesive tape which was resistant to changes of heat and moisture and storage, and if we conclude, as the evidence shows, that such a solution was discovered by using dioctyl phthalate or other plasticizer compatable with vinyl polymer and with a definite ratio which was

amount than said polymer and comprising at least a major proportion of a non-migrating viscous plasticizer resin, and the proportions being such that the adhesive tape has the properties of stretch, elasticity and retractability hereafter specified without causing pastiness or loss of the tack of the contracting adhesive in the roll; (2) an adhesive primer coating on the inner face of the film backing adapted to increase the anchorage of the adhesive coating; and (3) a water-insoluble normally tacky and pressure-sensitive rubber-resin type adhesive coating united to the inner face of said film backing, over said primer coating, said adhesive coating being thin in relation to said film backing; said film backing being in permanent equilibrium with said pressure-sensitive adhesive coating so as to avoid pastiness or loss of tack of the said adhesive coating and diminution of the flexibility of said film backing; said adhesive tape being unwindable from the roll without delamination of the tape or offsetting of the adhesive, being originally stretchable in widths not greater than about one inch by simple hand pulling, exercising a force of not more than about 10 to 15 pounds, to an extent of at least 50% at room temperature and being substantially completely retractable from an elongation of 30%, as herein specified; said tape being readily conformable to irregular surfaces in insulating wire splices and its elasticity, retractability and high adhesion value making it easy, in insulated splices, to produce snug wrappings and coverings, and said tape having sufficiently aggressive adhesiveness to remain tightly and snugly wrapped around splices and wires.

sufficiently low in volatility so that it was not driven off during milling, storage or from exposure; and the desired film could be produced from a mixture of 700 parts of Vinylite VYNS, 200 parts of Paraplex G–25, 100 parts of dioctyl phthalate and 25 parts calcium stearate milled together and calendered to a thickness of 4 mils; to which was added a primer made of 965 lbs. of an ammoniacal casein with 624 lbs. of an aqueous dispersion containing 38% by weight of a copolymer of 50 parts butadiene and 50 parts styrene after drying resulted in an extremely thin primer film then add to the primed film the mixture of properly apportioned elements constituting the pressure-sensitive adhesive, the three elements—film, primer and adhesive—, resulting in the new combination for making the desired tape as is taught in the Oace Patent, then it is obvious that a subsequent alteration of some of these elements, for example, by including two of them into one element, and thereafter using the result, could not invalidate the patent nor successfully avoid infringement. Judge L. Hand in Royal Typewriter Co. v. Remington Rand, 2 Cir., 168 F.2d 691, 693, tersely stated the principle in these words: "Courts have with curious unanimity held that it does not avoid infringement to combine into one member that which the patent discloses as two, if the single member performs the duties of both in the same way."

█ The accused tapes clearly infringe claims 1 of the original patent and 6 of the Re-issue. Not only are the accused tapes the equivalent of the tape embodied in the above claims but they are practically identical in result. Moreover, they actually embody the very chemical equivalents taught in both the original patent and in the Re-issue. It is significant that Plymouth discounted the value and marketability of plaintiff's product until it became the leader in the electric tape field. Plymouth's salesman discovered this and afterwards Plymouth came out with the accused tapes. In August, 1947, General Electric, speaking of No. 33 Scotch electrical tape (under Oace Patent), said: "For the first time in fifty years a revolutionary electrical tape is on the market ready for immediate delivery."

The commercial success of the patented tape was phenomenal. In 1945 the sales were $8,270.19; in 1946, $94,000; in 1948, $1,500,000 and in 1953 reached $8,712,744.75. When Plymouth copied Oace Patent, its sales jumped rapidly to $400,000 in 1952 and $500,000 in 1953. In 1950 and 1951, Plymouth's output was so small it did not bother to get the figures.

A decree will be entered permanently enjoining each defendant from further infringement and appointing Rufus Reynolds, Esq., to ascertain the damages.