**MINNESOTA MINING & MANUFAC-
TURING COMPANY, a corporation
of Delaware, Plaintiff,**

v.

**TECHNICAL TAPE CORP., a corporation
of New York; Technical Tape of Illinois, Inc., a corporation of Illinois;
Floyd R. Warner, and Levin Brothers
Paper Company, a corporation of Illinois, Defendants.**

**No. 54 C 1116.**

United States District Court
N. D. Illinois, E. D.

Decision on Merits

Dec. 5, 1961.

On Motions re Entering of Judgment
and for Taking Depositions
Jan. 9, 1962.

George I. Haight, Edward A. Haight, John W. Hofeldt, Haight, Lockwood & Simmons, Chicago, Ill., Harold J. Kinney, St. Paul, Minn., M. K. Hobbs, Winter Park, Fla., of counsel, for plaintiff.

Samuel W. Kipnis, Lucas & Thomas, Antonow & Fink, Chicago, Ill., Robert D. Spille, John A. Mitchell, Curtis, Morris & Safford, New York City, of counsel, for defendant.

ROBSON, District Judge.

Plaintiff charges defendants with infringement of its Reissue Patent No. 23,843 pertaining to insulating tape. The chronology [1] of the patents and pleadings and the history of related litigation [2] are outlined below.

The patent concerns a single strip [3] of stable, pressure-sensitive, highly *stretchable and retractable insulating tape* used by electricians. It is in roll form and when unwound does not delami-

---

1. February, 1945. First sale of patented tapes.
 January 12, 1946. Application for original Patent No. 2,559,990.
 July 10, 1951. Patent No. 2,559,990 issued to plaintiff, assignee.
 July 9, 1952. Application for reissue.
 June 29, 1954. Reissue granted.
 August 4, 1954. Instant complaint filed.
 September 30, 1954. Answers of defendants.
 April 15, 1955. Amended answer of defendants.

2. Minnesota Mining and Manufacturing Company v. Superior Insulating Tape Company, 284 F.2d 478 (8th Cir. 1960); Minnesota Mining and Manufacturing Company v. United States Rubber Company, 279 F.2d 409 (4th Cir. 1960); Sears, Roebuck and Company v. Minnesota Mining and Manufacturing Company, 249 F.2d 66 (4th Cir. 1957); Sears, Roebuck and Company v. Minnesota Mining and Manufacturing Company, 243 F.2d 136 (4th Cir. 1957); Plymouth Rubber Co. v. Minnesota Mining & Mfg., D.C., 185 F.Supp. 716; Minnesota Mining and Manufacturing Company v. United States Rubber Company, 178 F.Supp. 385 (D.C.N.C.1959); Minnesota Mining and Manufacturing Company v. Plymouth Rubber Company, 178 F.Supp. 591 (D.C.Ill.1959) (instant cause); Minnesota Mining and Manufacturing Company v. Sears, Roebuck and Company, 141 F.Supp. 686 (D.C.N.C.1956); Minnesota Mining & Manufacturing Company v. Technical Tape, 23 Misc.2d 671, 192 N.Y.S.2d 102 (1959) (N.Y.Supr.Ct.).

3. 4 to 10, 12 or 20 mils. The patent specifications state 5–10 mils generally most useful.

nate.[4] The film backing[5] has the advantage of being stretchable by simple hand pulling[6] from 50 to 100% at room temperature, and then being retractable. This feature makes it invaluable in covering cable splices because it can be wrapped on easily and snugly in one operation. It is also safely and readily usable by workmen making splices while working on high poles. The rolls of tape do not deteriorate because the plasticizers in the vinyl backing do not migrate to the adhesive[7] which, if they did, would cause it to become soft, pasty or lose tack. Patentees assert that they achieve this singular end by using in the vinyl backing of the tape a combination[8] of plasticizers of both high and low molecular weights (a heterogeneity of molecular weights both over and below 1,000).[9] The tape conforms to irregular surfaces. The backing is water and hydrocarbon-oil insoluble. This is highly usable in industry and mining because it is impervious to elements and rough surfaces causing deterioration or corrosion. It has high dielectric strength.

The issues are the validity and infringement of claims 1, 3, 4, 6, 7, 8 and 9.

The plaintiff is the owner of the patents and the defendants are the manufacturer, distributers and users of the alleged infringing tapes.

The novelty and virtues of the reissue patent are stated in example 5 thereof.[10]

The permanent equilibrium between backing and adhesive is said by the patent to be secured by employing with the vinyl

---

4. Or offset the adhesive.

5. A homogeneous mixture of a stable blend of a film-forming polymer of monomers, 70 parts of a copolymer of vinyl chloride or a major proportion of vinyl chloride, and a substantially non-volatile plasticizing material of at least $\frac{1}{3}$ but not over $\frac{1}{2}$ the weight of the polymer and at least the major proportion of the non-migrating viscous plasticizer resin.

6. Exerting force of not more than about ten to 15 pounds.

7. A eucohesive, water-insoluble, non-corrosive, normally tacky and pressure-sensitive rubber resin type thin coating. Eucohesive is defined to mean more cohesive than adhesive, the adhesive not coming off the backing when in rolls, or being handled.

8. Not to exceed 20 parts per 100 parts of the vinyl polymer of a low molecular weight liquid plasticizer and a similar or somewhat greater amount of the higher molecular weight resinous type plasticizer.

9. While the patent does not use the figure of 1,000 as the dividing line between high and low molecular weights, this record (as did the record in the Fourth Circuit case and its opinion) indicates the recognized existence in the art of such a classification of molecular weights.

10. " * * * The novel article of our invention is a broadly new article of commerce. Prior to our invention there was no electrical or plastic tape available which was similar to the product of this invention either in performance characteristics or in appearance or handling characteristics. No pressure-sensitive adhesive tape was previously available which was of sufficient thickness (i. e., 4 to 20 mils) to provide suitable dielectric strength and yet of handling characteristics such that it was readily stretchable by hand pulling to an extent of at least 50% at room temperature and substantially completely slowly retractable from an elongation of 30% as herein specified. Again, no tape of such thickness and other properties was previously available to industry in which the backing film had high resistance to both hydrocarbon oils and water and also was in 'permanent equilibrium' with the pressure-sensitive adhesive coating, so as to avoid pastiness or tack loss of the adhesive. For these and other reasons, the novel article of this invention is a commercially new thing: it is a new type of tape, actually and commercially. There is no product in the prior art which resembled it, or was able to compete with it.

"Where the term 'rubber resin type' is used in defining the adhesive layer in the claims, it simply means a normally tacky and pressure-sensitive adhesive, such as one having properties of tack, pressure sensitivity, cohesiveness, et cetera, similar to the physical characteristics possessed by rubber resin, pressure-sensitive adhesives of the prior art."

chloride polymer a combination of modifiers including a substantial but minor amount (not to exceed 20 parts per 100 parts of the vinyl polymer) of a low molecular weight liquid plasticizer such as dioctyl phthalate, together with a substantially equal or somewhat greater amount of a high molecular weight resinous type plasticizer. The specifications cite as suitable resinous type plasticizer, Paraplex G–25, or polymerized ethyl acrylate, and polymerized vinyl butyl ether.

The parties (plaintiff and Technical Tape Corporation) have stipulated that Tuck Vinyl Plastic Insulating Tapes were made and sold prior to the commencement of this suit and subsequent to the date of the issuance of the original patent, and that those tapes are pressure-sensitive stretchable and retractable vinyl plastic insulating tapes in which the backing film has a thickness of 4 to 20 mils. Further it is agreed that the tapes utilized as the backing member primarily vinyl films produced by Bakelite Company,[11] Ross & Roberts, and Monsanto Chemical Company.

Plaintiff stresses that no tape plasticized with Paraplex G–40 is involved in this suit (which tape was held in the Fourth Circuit suit not to be of an infringing nature) inasmuch as there was testimony that no G–40 film was furnished to Technical Tape after March, 1951.

*Validity.* The validity of this patent has been sustained [12] in prior litigation, and a review of this record furnishes no basis for a difference of opinion. Plaintiff concedes that the elements of the patented combination were old in the art, but contends that no one perceived even after extensive experimentation that the peculiar combination of low and high molecular weight plasticizers could effect a permanent equilibrium in the vinyl backing so that it would not migrate to the adhesive, causing its deterioration.

Plaintiff cites the statutory presumption of validity (35 U.S.C. § 282) of a patent, buttressed as it is here by its issuance over the same patents cited in the file wrapper which are named in the court proceedings to defeat its validity (Williams Mfg. Co. v. United Shoe Mach. Corporation, 121 F.2d 273 (6th Cir. 1941), affirmed 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942)).

11. A stipulation discloses that this company's employees would testify that its proportions of plasticizers used would be:

| | | Parts of plasticizer per 100 parts of Vinyl polymer | Parts of each plasticizer per total plasticizer content |
|---|---|---|---|
| VUWA 50635 | Paraplex G–40 | 33–50 | 100 |
| VUWA 50907 | Paraplex G–40 | 50–60 | 100 |
| VUWB 59149 | Flexol R2H | | 55 |
| | Paraplex G 60 | | 24 |
| | Dioctyl Phthalate | | 21 |
| | Total plasticizer content | 33–50 | 100 |
| VU 5946 | Flexol R2H | | 85 |
| | Paraplex G 60 | | 15 |
| | Total plasticizer content | 50–60 | 100 |
| KDA 2973 | Flexol R2H | 50–60 | 100 |

12. Sears, Roebuck and Company, et al., v. Minnesota Mining and Manufacturing Company, 243 F.2d 136 (4th Cir. 1957).

The problem of poisoning of the adhesive was known for many years and its solution was studied without success by Tierney, Hurd, Danovitch, and Schmidt, which fact plaintiff cites as indicative of invention (Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909); Smith v. Snow, et al., 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Reiner, et al. v. I. Leon Co., Inc., 285 F.2d 501 (2nd Cir. 1960)).

██ ██ The need for a pressure-sensitive stretchable and retractable tape was evident, but there was nothing available to fill the need. This factor, plaintiff points out, is indicative of invention in a product which fills the need (Inland Mfg. Co. v. American Wood Rim Co., 14 F.2d 657 (6th Cir. 1926); Reiner, et al. v. The I. Leon Co., Inc., 285 F.2d 501 (2nd Cir. 1960)) as is the imitation of the product by competitors (Kurtz v. Belle Hat Lining Co., Inc., 280 F. 277 (2nd Cir. 1922); Charles Peckat Mfg. Co., et al. v. Jacobs, 178 F.2d 794 (7th Cir. 1949)), especially where the elements to achieve the invention were long available (Reiner, et al. v. I. Leon Co., Inc., 286 F.2d 501 (2nd Cir. 1960); Minnesota Mining and Mfg. Co. v. International Plastic Corporation, et al., 159 F.2d 554 (7th Cir. 1947)), and even the inventor worked long to effect the invention (Graver Tank & Mfg. Co., Inc., et al. v. Linde Air Products Co., 336 U.S. 271, 273, 69 S.Ct. 535, 93 L.Ed. 672 (1949)). The warm reception of the product also bolsters the conclusion of invention (Wahl Clipper Corporation v. Andis Clipper Co., et al., 66 F.2d 162 (7th Cir. 1933); England v. Deere & Company, 284 F.2d 460 (7th Cir. 1960)). It was described as "revolutionary" by a supplier.

Consequential to the pioneer scope of this invention, plaintiff claims broad equivalence and interpretation of the patent (Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Smith v. Snow, et al., 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Chicago Patent Corporation v. Genco, Inc., 124 F.2d 725 (7th Cir. 1941)).

None of the prior art citations reveal stretchable and retractable tape possessing permanent equilibrium. The most formidable citation, the Schmidt patent No. 2,332,265 (also a file wrapper citation), is differentiated by plaintiff as covering a much thinner—two mil—vinyl backing, with an adhesive that neither party to the instant suit uses. His tape is at least relatively non-stretchable. The evidence fails to disclose he ever marketed a stretchable retractable pressure-sensitive tape; he did not achieve permanent equilibrium.[13] Similar and more serious deficiencies inhere in the allegedly anticipating patents of Kratz,[14] Semon,[15] Groff,[16] Wright,[17] Fikentscher,[18] Nowak[19], Hemperly,[20] Eustis (two patents),[21] Marshall,[22] Endres,[23] and Nollau.[24]

13. It is also maintained by plaintiff that to follow Schmidt's teachings would lead away from the patentees' invention. The tape backing used by Schmidt is coated with polyisobutylene, "a rather weak adhesive material" not suitable to plaintiff's tape nor used by it.

14. Not a pressure-sensitive stretchable retractable adhesive tape.

15. File wrapper patent not pressure-sensitive adhesive.

16. File wrapper patent not pressure-sensitive adhesive.

17. Not stretchable and retractable; nor pressure-sensitive adhesive.

18. Not presure-sensitive adhesive.

19. Not pressure-sensitive adhesive.

20. File wrapper reference; not stretchable and retractable.

21. (No. 2,385,319) Not permanently pressure-sensitive, becoming non-tacky; not stretchable-retractable vinyl backing. (No. 2,429,223) Electrical conductive metallic foil backing.

22. Not vinyl backed pressure-sensitive adhesive; not stretchable and retractable.

23. Not pressure-sensitive adhesive.

24. Cloth, not polyvinyl chloride backing, not stretchable, retractable, nor insulating.

As the Court reads the Oace patent, including the italicized portions emphasizing the new material of the reissue, it is evident that the gist of the invention is the achieving of a permanent equilibrium in the vinyl backing of the stretchable tape so that the adhesive remains tacky for long periods of time although wound upon itself, and the tape is pliable for easy and efficacious application to an electrical splice or other wiring. The statements added by the reissue are more in the nature of a clarification of ideas theretofore disclosed than enlargement of the claimed invention.

There can be no serious quarrel with the legal principles stated by the defendants, such as the claims of a patent are the measure of the invention; [25] merely selecting a known material to meet known requirements does not constitute invention; [26] a patentee may not compel independent experimentation by others to ascertain the bounds of his claims; [27] a patentee may not, by claiming a product or method in terms of a result, function or broad class, foreclose all means and ways of practically obtaining such results; [28] clear lack of invention cannot be outweighed by commercial success; [29]

and the presumption of validity does not exist as against pertinent prior art which was not considered by the Patent Office. [30]

Similarly, as to defendants' further contentions that it is not the purpose of the patent laws to grant a monopoly for every trifling device; [31] omission of an element of a patent claim avoids infringement; [32] the doctrine of equivalence has no application where one of the elements of a patent claim is omitted; [33] reissue claims must be for the same invention as originally disclosed, or they are void; [34] and ambiguous, indefinite and vague patent claims are void. [35] These are excellent legal cliches that under proper circumstances and with record that would support their application should be applied. Defendants, however, have neither the proper circumstances nor a record that make these statements appropriate to their cause.

Validity is also challenged on the ground that the reissue patent is invalid because not for the same invention as the original patent. [36] Plaintiff ascribes a different and broader viewpoint to construction of "sameness" of the original and reissue patent [37] as permitting a

---

25. Graver Tank & Mfg. Co., Inc. et al., v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949); 35 U.S.C. § 112.

26. Johnson Laboratories, Inc. v. Meissner Mfg. Co., et al., 98 F.2d 937 (7th Cir. 1938); Sinclair & Carroll Co., Inc. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

27. Standard Oil Co. of California v. Tide Water Associated Oil Co., 154 F.2d 579 (3rd Cir. 1946).

28. Holland Furniture Company v. Perkins Glue Company, 277 U.S. 245, 255–258, 48 S.Ct. 474, 72 L.Ed. 868 (1928); National Carbon Co., Inc. v. Western Shade Cloth Co., 93 F.2d 94 (7th Cir. 1937).

29. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S. Ct. 647, 89 L.Ed. 973 (1945).

30. Day-Brite Lighting, Inc. v. Sandee Manufacturing Co., 286 F.2d 596 (7th Cir. 1960).

31. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438 (1883).

32. U. S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942).

33. Sears, Roebuck and Company, et al. v. Minnesota Mining and Manufacturing Company, 249 F.2d 66 (4th Cir. 1957).

34. U. S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942); Kalich, et al. v. Paterson Pacific Parchment Co., 137 F.2d 649 (9th Cir. 1943).

35. The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221 (1895).

36. U. S. Industrials Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942); Kalich, et al. v. Paterson Pacific Parchment Co., 137 F.2d 649 (9th Cir. 1943).

37. American Automotoneer Co., et al. v. Porter, 232 F. 456 (6th Cir. 1916). The Court in Minnesota Mining and Manu-

clarification,[38] and points out that a reissue granted after a contest in the Patent Office raises a strong presumption in its favor.[39] The supplemental oaths of the inventors in applying for the reissue pointed out the necessity for clarification.

 The Court is of the opinion that the Patent Office properly granted the reissue, it being not a widening of the original invention claimed but simply a clarification, eliminating discrepancy between claims and specifications and failure adequately to claim their invention.

The tapes made with VU 5946 were found by the District Court (C.A. 879–G; North Carolina) to infringe. This Bakelite film VU 5946 has been proved to be constituted of two plasticizers, that of R–2H and Paraplex G–60. The R–2H (marketed by Carbide & Carbon Chemical Corporation) was found to be a viscous, non-migrating alkyd plasticizer resin of the polyester type, like Paraplex G–25 and Paraplex G–40. Flexol R–2H was analyzed to have (1) as 17% of its plasticizer, a number average 765 molecular weight, and (2) 83% of the plasticiz-

er, a number average molecular weight of 1400.

Paraplex G–50 the evidence discloses had (1) a low fraction constituting 14% of the plasticizer weight, of number average molecular weight of 630, and (2) a high fraction, constituting 86% of number average molecular weight of 1619. Bakelite VU59149 contains as 45% of the total plasticizer, a low plasticizer of DOP and G–60 (1000 number average molecular weight) and Flexol R–2H.

Monsanto's Admex 761 was found on analysis to be composed of (1) 12.8% of plasticizer, a number average molecular weight of 608, and (2) 65.2% of plasticizer, a 1122 number average molecular weight (22% of the plasticizer backing was not extracted).

The tapes of defendants charged to infringe are known as "Tuck" Vinyl Plastic Insulating Tape and "Tuck" Vinelectric Tape, sold under numbers 330 and 220.[40]

 The Court concludes that the reissue covers a valid, patentable invention, which is entitled to broad interpretation and range of equivalence.[41]

facturing Company v. Sears, Roebuck and Company, 141 F.Supp. 686 (D.C.N.C. 1956), said at p. 689: "The specification of the reissue is the same as the original patent except comment on the novelty of the tape and definition of terms. There are no additional disclosures of a tape or how to make it. The claims of the reissue appear to embody nothing not disclosed in the original application and invention and they do not broaden the disclosures of the original patent but are further descriptive * * * of the teachings of the original patent."

38. Engineering Development Laboratories v. Radio Corporation of America, 153 F. 2d 523 (2nd Cir. 1946).

39. Weller Mfg. Co. v. Wen Products, Inc., 121 F.Supp. 198 (D.C.Ill.1954); aff'd 231 F.2d 795 (7th Cir. 1956); Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4th Cir. 1936).

40. Claims 1, 3, 4, 6, 7, 8 and 9 are charged to be infringed by:
(1) Type B, Ross & Roberts vinyl film plus Rohm and Haas G–50 manufactured by New York defendant.

(2) KDA 2973 (Bakelite vinyl film Flexol R–2H also manufactured by New York defendant.
(3) Monsanto Ultron R–187, plasticized with Archer-Daniels-Midland Admex 761 film.
Claims 1, 3 and 4 of original patent (under doctrine of equivalents) are further charged to be infringed by products of Technical Tape Corporation (New York) thus constituted:
Bakelite's vinyl film VUWB 59149 contains 33–50 parts plasticizers of which plasticizer contents 55 parts are Flexol R–2H, 24 parts Paraplex G–60, and 21 parts dioctyl phthalate.
Bakelite's vinyl film VU5946 (formerly VUWB 59420) contains 50 to 60 parts plasticizer of which plasticizer 85 parts are Flexol R–2H and 15 parts are Paraplex G–60 (tape using this vinyl film was found to infringe in Minnesota Mining and Manufacturing Company v. Pine State Electrical Supply Co., Civ. No. 879G, U.S.D.C., M.D.N.C., June 4, 1956).
Type B film of Ross and Roberts film employing 55.2 part of G–50.

41. Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U.S.

*Infringement.* Claims 1, 3 and 4 of the original patent are charged to be infringed [42] on the basis of the doctrine of equivalence, and claims 6, 7, 8 and 9 of the reissue are asserted to be literally infringed. Plaintiff points out that the tapes here involved are not plasticized with G–25 or G–40, the only plasticizers passed upon by the Court of Appeals for the Fourth Circuit, which reversed the District Court's (North Carolina) finding of infringement. Plaintiff additionally points out that the plasticizers used in the tapes here alleged to infringe were proved by analyses to contain both high and low molecular weight plasticizers. The evidence discloses a substantial proportion of liquid, low molecular weight non-resinous plasticizer.

It is plaintiff's position that its expert, Dr. Wall's analyses of the plasticizers in the accused tapes revealed the presence of two plasticizers, of both high and low molecular weights, and the low molecular weight fraction was non-resinous. Therefore, the finding of non-infringement by the Fourth Circuit on a different tape, with different plasticizers there found to be wholly resinous, is inapplicable here.

Plaintiff also maintains that the Fourth Circuit's finding of non-infringement (as to a tape not here involved) is predicated upon an unwarranted assumption that the Oace patent requires the plasticizer not to be wholly resinous, when the patent makes no such requirement. In any event, it maintains the record in the instant case much more clearly and specifically proves that the allegedly infringing tapes definitely contain the two kinds of plasticizers, and that the low molecular plasticizer is in fact non-resinous, a liquid ester plasticizer, mobile and migratory, equivalent to dioctyl phthalate (DOP) of the patent.[43]

The plaintiff points out that there can be no question on the issue of infringement that defendants' insulating tapes charged to infringe are stretchable-retractable and possessing permanent equilibrium and are between 4 and 20 mils thickness, so that the only question remaining is that of the use of double or dissimilar plasticizers in the vinyl backing. It further points out that defendants' tapes are wound upon themselves without liners, yet are unwindable without delamination or offsetting of the adhesive, yet the adhesive does not get pasty or lose its tack. They are water-insoluble and hydrocarbon oil-insoluble, and have high dielectric strength. Defendants even imitate plaintiff's numbering of their tapes, adding a zero to the Nos. 22 and 33 of the plaintiff, and calling their tapes Nos. 220 and 330.

While infringement can be avoided by the failure to use a material element of the claim of a patent, such infringement is not avoided where all elements are utilized in a combined form. This fundamental principle was recently stated in a Seventh Circuit Court of Appeals opinion in this way:

"Infringement is not avoided by making into one part that which has been shown as two where there is no change in the function or manner of operation of the element." (Zysset, et al. v. Popeil Brothers, Inc., 276 F.2d 354, 357 (1960)).

405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Miller v. Eagle Manufacturing Company, 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Specialty Equipment and Machinery Corp. v. Zell Motor Car Co. et al., 193 F.2d 515 (4th Cir. 1952); Smith v. Snow, et al., 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Chicago Patent Corporation v. Genco, Inc., 124 F.2d 725, (7th Cir. 1941); Raybestos-Manhattan,

Inc. v. Texon, Inc., 268 F.2d 839 (1st Cir. 1959).

42. By products sold before June 29, 1954, the date of the reissue.

43. Plaintiff states G–50, R–2H, and Admex 761 are proved to be composed of "2 different materials, premixed by synthesis, one viscous and resinous, with a range of molecular weights above 1000, the other a liquid ester of low molecular weight (less than 1000) and free flowing."

Similar holdings are Hydraulic Press Mfg. Co. v. Williams, White & Co., 165 F.2d 489 (7th Cir. 1947); Borg-Warner Corp. v. Mall Tool Co., 217 F.2d 850 (7th Cir. 1954); Simplex Appliance Co. v. Star Can Opener Co., 37 F.2d 491 (7th Cir. 1930); 69 C.J.S. Patents § 298, p. 867.

Especially easy would an infringement of a chemical patent be if a contrary rule were to obtain because of the facility of mixture of the chemical components. Defendants in this case utilized products manufactured by others, which materials were composed of high and low molecular weight plasticizers. The purchased items incorporated in a vinyl backing were then combined with the pressure-sensitive adhesive and the resulting products had the identical advantageous qualities of the patented invention, functioning in the same way.

The record is replete with the testimony of the experts as to the constituent elements of Flexol R–2H, Paraplexes G–25, G–40, G–50 and G–60; and Admex 761. Inconsistencies and disputes occur. The Court is of the opinion, however, that the testimony of actual analyses of the accused tapes must be accorded greater weight than the somewhat vague testimony of the witnesses connected with the firms manufacturing the said items. The testimony of Doctor Wall is not directly conflicting with the testimony of others inasmuch as their testimony pertains to chemical properties other than those of immediate pertinency to a determination of scope and infringement of the patent sued upon.

The various accused tapes contained as plasticizers G–50, G–60, Flexol R–2H, and Admex 761. Dr. Wall's testimony clearly established that his tests of the component parts of those materials showed high and low molecular weight plasticizers.[44]

Plaintiff's expert testimony conclusively establishes that the low molecular weight plasticizers of the accused tapes were non-resinous, serving to achieve permanent equilibrium, and that tests with but one of the plasticizers resulted in migration. Plaintiff points out that it uses the word "equivalent" in its legal, and not chemical, sense, which is permssible under precedent,[45] and that this substitution is a physical equivalent. It is also stressed that the variations in proportions of the two plasticizers to each other and to the total vinyl chloride polymer used in the tapes are recognized in the patent's teachings to depend on the nature of the respective plasticizers themselves. Plaintiff points out that while but three of the five allegedly infringing tapes have a phthalyl ester present, the remaining two have adipyl esters which plaintiff's experts deemed equivalent, so that infringement was not avoided.

Plaintiff refutes the soundness of the testimony relied upon by defendants as challenging Dr. Wall's findings on the ground that their quotations are taken out of context; as being with reference to outdated experience; or involving a play on words; or the making of vague or qualified statements, or statements not based on personal knowledge. It is very apparent that these are diversionary tactics used in an attempt to prejudice or lead the court to adopt a position that is legally untenable. Plaintiff further notes that the manufacturers of the plasticizers used in the accused tapes made no fractionation tests in the period involved. Plaintiff further points out that defendants do not trouble to refute infringement of their tapes made on Bakelite Films VU 5946 and VUWB 59149.

44. G–50, with type B Ross and Roberts, had 14% of 630 low molecular weight and 86% of higher molecular weight of 1619: Flexol R–2H composed of KDA 2973, VUWB 59149 and VU5946 had 17% of low molecular weight of 765, and 83% of high molecular weight of 1394;

Admex 761 containing Ultron R–187 had 10.2% of low, 502, molecular weight, and 89.8% high, 1698, molecular weight.

45. Walker, Patents, Deller's Edition, Vol. 3, Sec. 490, p. 1740; Welsbach Light Co. v. Sunlight Lamp Co., 87 F. 221 (2nd Cir. 1898).

■ The Court is of the opinion that the charge of infringement has been completely sustained by the proof of plaintiff's experts that fractionation analyses revealed upon examination of the accused tapes, the presence of two plasticizers possessing respectively high and low number average molecular weights as taught by the Oace patent; that use of but one of the plasticizers so procured by fractionation was not sufficient to preclude migration, and loss of tack. The Court deemed Dr. Wall, completely credible, possessing admirable expert qualifications, and was impressed by his testimony relative to the tests he performed in determining the chemical content of the defendants' accused tapes.

The Court concludes therefore that the tapes using Bakelite film VUWB 59149 utilizing R–2H, G–60 and DOP, and VU 5946, infringe claims 1, 3 and 4, the original claims, and the other tapes infringe 1, 3, 4, 6, 7, 8 and 9.

The Court adopts the Findings of Fact and Conclusions of Law submitted by the plaintiff. Plaintiff is directed to submit an order consistent with this decision and said Findngs of Fact and Conclusions of Law within ten days.

### On Motions re Entering of Judgment and for Taking Depositions

Plaintiff has presented a form of judgment in this cause, and defendants have moved to suspend the entry of any judgment pending the taking and filing of depositions concerning plaintiff's alleged anti-trust violations. This Court has heretofore, on December 5, 1961, rendered a decision on the merits of this cause finding validity of the patent and infringement by defendants.

On January 4, 1962, defendants moved to suspend the entry of judgment until they took the depositions of seven named individuals "relating to plaintiff's violations of the Anti-Trust laws in connection with pressure-sensitive tapes including vinyl tapes," and cite the fact that on December 13, 1961, plaintiff was indicted by the United States District Court for the Eastern District of Illinois (No. 61–73–D) for violation of the Anti-Trust Laws, 15 U.S.C.A. §§ 1 and 2, in a nine-count indictment, including pressure-sensitive tapes with vinyl plastic backing, in attempting to monopolize commerce in the manufacture and sale of such tapes in violation of Section 2 of the Sherman Act, by coercing competitors to accept patent license agreements, or threatening to sue for infringement, the license agreements containing objectionable tie-in agreements, etc. The indictment further charges that plaintiff conspired with nine other companies beginning in 1933 to restrain trade in pressure-sensitive tapes in violation of the Sherman Act through price-fixing agreements, by amassing patents and coercing restrictive license agreements. The indictment also covered other matters not here pertinent.

Defendants strongly urge that this Court must consider even at this late stage of this matter the evidence as to unclean hands on the part of the plaintiff-patentee. In support of this contention, they cite the very well-known case of Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, where the Supreme Court directed in *1944* that the Circuit Court of Appeals for the Third Circuit vacate its *1932* judgment wherein a patent had been held valid and infringed. Fraud was proved by conclusive evidence to have been perpetrated upon the Patent Office in the procurement of the patent, and the Supreme Court said even if the defendant had failed to exercise due diligence to uncover the fraud, relief could not be denied on that ground alone since public interests were involved. As the opinion of the Supreme Court notes, there was "undisputed evidence" of the fraud, and proof of the scheme was "conclusive."

While the date of the above-outlined indictment is after the decision of this Court, the existence of the Grand Jury investigation was no secret. In fact, in defendants' pre-trial memorandum, dated July 8, *1959*, two and a half years ago, it stated:

"Technical Tape has been chosen to serve as the new target in Minne-

sota's war to establish a monopoly over all vinyl plastic tape. Such tactics have aroused interest in many quarters. One worthy of mention is the current Federal Grand Jury investigation now going on in Danville, Illinois where Minnesota's activities regarding patents are undergoing scrutiny."

Defendants' sudden desire to revive this sleeping issue after an adverse decision is not too appealing.

The Court does not belittle the importance of the principle enunciated in United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465, which is that:

"It is now, of course, familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse or thereafter until the effects of such misuse have been dissipated, or 'purged' as the conventional saying goes. [Citing cases.] The rule is an extension of the equitable doctrine of 'unclean hands' to the patent field. In terms of this case this means that Gypsum may not recover from these appellees for their use of its patents between February 1, 1948, and May 15, 1951, if Gypsum has been guilty of misuse of the patents since 1948, or if the original misuse found in the antitrust litigation remained unpurged. *This issue, of course, involves essentially a question of fact. And since the record is barren of any facts with respect to the situation existing in the gypsum industry since 1941, we think that the District Court erred in holding purely as a matter of law that an unpurged mis-use had been shown."* (Emphasis ours.)

This suit was instituted August 4, 1954, seven and a half years ago. There was a full trial on the merits. The Court's memorandum reveals this patent was long and frequently the subject of prior litigation. Now that the Court's adverse decision has been announced, and new counsel substituted for the defendants, these motions are made. The Court is of the opinion that a wise exercise of its discretion warrants their denial, in the absence of more concrete evidence than the return of an indictment only in part and indirectly making possible reference to the subject matter of the patent here involved. It would not be in the interest of justice to postpone the decision and judgment in a suit of seven and a half years' standing on the nebulous charges now raised by the indictment. This is not a situation comparable to that involved in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, where conclusive fraud in the procurement of the patent was demonstrated. Defendants have had ample opportunity to secure all the discovery they needed to establish the accusation of unclean hands, the possible existence of which they were cognizant, in respect to plaintiff's use of its patent and licenses. They failed to avail themselves thereof. The instant litigation should not be permitted to drag on still longer on defendants' effort to procure a possible tenable defense.

The draft of judgment submitted by plaintiff is approved. The motion of defendants to suspend the entry of the judgment is denied and the motion under Rule 27(b), 28 U.S.C.A., to take depositions to perpetuate testimony is denied.